# Richmond.

## Southern Railway Co. v. Bruce's Adm'r.

### April 6, 1899.

1. Instructions — *Inapplicable — Misleading.*—Although an instruction correctly states the law, yet if not applicable to the facts and circumstances of the case it tends to mislead the jury and should not be given.

2. Railroads—*Crossing—Traveller—Licensee.*—A traveller injured by a railroad train at a public crossing stands on a higher footing than a licensee walking on the track, and, even among licensees, a higher degree of care is required of a person of mature years and in the possession of all his faculties than of an infant of tender years.

3. Contributory Negligence — *How Shown — Burden of Proof.*— Although, as a general rule, the burden is on the defendant to show the contributory negligence of the plaintiff if it be relied on as a ground of defence, yet if the contributory negligence of the plaintiff is disclosed by his own evidence, or may be fairly inferred from all the facts and circumstances of the case, the burden still rests on him to relieve himself of the suspicion of his own negligence, and it is error to instruct the jury, without qualification, that the burden is on the defendant to prove the contributory negligence of the plaintiff.

4. Railroads — *Licensee—Care Required—Contributory Negligence—Case at Bar.*—It is the duty of a railroad company to use reasonable care to avoid injury to a licensee on its track, but it is equally the duty of the licensee to take ordinary precautions for his own safety, even if there be negligence on the part of the company, and if, through his failure to do so, he is injured he cannot recover. The question is not whether the plaintiff's negligence *caused,* but whether it *contributed* to the injury, and if it did so there can be no recovery therefor. In the case at bar, the negligence of the

plaintiff's intestate contributed to his injury, and there can be no recovery therefor. He walked on the track when there was another safe, suitable, and convenient walk-way. He apparently neither looked nor listened for approaching trains, and failed to get off the track, though others near him did so.

Error to a judgment of the Corporation Court of the city of Danville rendered April 18, 1898, in an action of trespass on the case wherein the defendant in error was the plaintiff, and the plaintiff in error was the defendant.

*Reversed.*

The opinion states the case.

*Blackford, Horsley & Blackford,* for the plaintiff in error.

*Eugene Withers* and *Thomas Hamlin,* for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

This is a suit brought in the Corporation Court of the city of Danville by the administrator of L. R. Bruce, to recover damages for the death of Bruce, caused, as is alleged, by the negligence of the Southern Railway Company, and the verdict and judgment is for the plaintiff for the sum of $5,350, to which judgment the defendant company was awarded a writ of error by this court.

The Southern Railway enters North Danville upon the north side of Dan River, making with the river, as it approaches, an acute angle with its point to the south and its opening to the north. The depot in North Danville is at the point where the railroad is nearest to the river, and from there it runs down the bank of the river some distance, and then crosses it to the south side, where the city of Danville is situated. About a half mile north of the depot in North Danville, a public road from Danville to Henry Courthouse crosses the railroad, and at this crossing this road is called Henry street. Near by is situated the station

signal post, and the steepest grade is from that signal post, something over a quarter of a mile southward, to a trestle which crosses a deep ravine. This trestle is situated just at a point where the line of the railroad from the north turns on a sharp curve to the left, so as to become nearly parallel to the river, and near the south end of this curve is situated the main building of the Riverside Cotton Mills. The space between the railroad and the river, beginning at the trestle and running almost all the way down to the depot, belongs to the Riverside Cotton Mills Co., and the centre of its principal building is a little south of the south end of the trestle. The streets of North Danville do not cross the railroad at any point opposite the property of the Riverside Cotton Mills Co., but stop at the east line of the railroad company's right of way. There are paths down the incline of these streets, used largely by employees at the Cotton Mills and persons working in the mills and factories on the south side of the river in the city of Danville; and in Pickett street, the nearest of these streets to the trestle, there are wooden steps coming down the incline of the street twenty or twenty-five feet, connecting with a .platform over the space between the foot of the embankment and the end of the railroad ties, just opposite the entrance of the main building of the Cotton Mills. Upon the western side of the railroad is a fence nearly the entire length of the Riverside Cotton Mills property, eight feet high, put up by the latter company. Upon the eastern side there is no fence, but an embankment, the highest portion of it being on the inside of the sharp curve in the railroad, near the trestle, where it is from fifteen to twenty feet high; and upon both sides of the railroad track from the trestle to a point some distance past the place where the accident occurred, which is the subject of this suit, there is a space sufficiently wide for pedestrians to walk. The one on the east side of the railroad track, and between it and the embankment, is narrow, however, and serves principally to catch and carry off surface water from the high ground

adjacent, while that on the west side of the railroad track, between it and the fence in front of the Riverside Cotton Mills property, is much wider, and affords ample space and a convenient walkway for travellers. This space is at no point less than four feet wide, and at others as much as twelve or more feet, there being nothing thereon to obstruct it as a walkway to some distance below where the accident occurred, unless it be the iron bars connecting the rails of the side-track, with the switching post set within the fence at a point a little below the place of the accident, which are not more than three or four inches from the ground.

The deceased, a young man about nineteen years of age, in good health, and his eyesight and hearing not at all impaired, had been in North Danville two days prior to his death, boarding at the house of one Cobb, in full view of the railroad and its trains passing in and out of North Danville at all hours of the day and night. His mission to North Danville was to get work, as Cobb, with whom he was boarding, testified; and, on the morning of July 27, 1897, he left Cobb's house at an early hour, and about half past six o'clock entered upon the railroad at or near the north end of the trestle of which we have been speaking, and, crossing the deep ravine there either over or under the trestle, he continued southward on the railroad track towards the depot. He had passed the main entrance to the largest building of the cotton mills, and was opposite the clearance post, just above where a side-track to the storage warehouse of the cotton mills makes off from the main track of the railroad, when he was struck and killed by the Washington and Southern Limited Express train No. 37, of the defendant company, going south, which was running into North Danville an hour behind its schedule time.

At the trial of this cause the court gave seven instructions asked for by the plaintiff, to two of which, Nos. 1 and 7, the defendant company excepted. They are as follows:

" 1. The court instructs the jury that a railroad company running and operating its trains through a city, where its track and right of way is constantly used as a footway by large numbers of men, women and children passing over it daily, and at all times, must use greater care and diligence to prevent injuries to persons and property than is required of them in running and operating their trains in less frequented and populous localities, and so in certain localities in the town greater precaution may be necessary than in others, for example, if the train is being carried around a curve, objects or persons on the other side of which are hidden from view, it is required of them to resort to special precautions, depending upon the particular locality and the circumstances, to avoid accidents, and any neglect of such precautions as are proper under the peculiar surrounding circumstances of the locality, constitutes negligence for which the railroad company is liable in damages, unless the plaintiff's intestate, by the exercise of ordinary care on his part, could have prevented the accident; and the burden of proof is on the railroad company to prove such absence of ordinary care on the part of the plaintiff's intestate."

" 7. The court further instructs the jury that if they believe from the evidence that the road-bed and track of the defendant company, at and near the point where the plaintiff's intestate is alleged to have been killed, was situated in the city of Danville, Va., and that, owing to sharp curves in the said tracks, and embankments alongside of it, and other obstructions on the side of and near said track at and near that point, the engineer was prevented from seeing objects upon the track in front of the train at as great a distance as he otherwise could have seen such objects, and that he was prevented from seeing them at a sufficient distance to stop his train before running upon them when running at the rate of speed usually maintained at or near said point, and that large numbers of men, women and children daily passed along and upon defendant's track at and near that point,

and especially from 6 to 7 o'clock in the mornings, and that the defendant company had notice of such use of its track and acquiesced therein, then it would be the duty of the defendant company to exercise such reasonable care and precaution before passing said curve, embankment, or other obstruction at or near such point, as to protect from injury such men, women and children whom they might reasonably expect to be on their track at that point; and if the jury further believe that the defendant company failed to exercise such care and precaution in order to protect such persons, and that, in consequence of such failure, the plaintiff's intestate was killed, then they must find for the plaintiff, unless they further believe that the plaintiff's intestate was guilty of such negligence on his part as was the proximate cause of his death, and the burden of proving such contributory negligence on the part of the plaintiff's intestate is upon the defendant company."

It is contended on behalf of defendant in error that these instructions, embody the principles enunciated by this court in the cases of *Blankenship* v. *C. & O. Rwy. Co.*, 94 Va. 449, and *Kimball & Fink, Receivers,* v. *Friend's Adm'r,* 95 Va. 125; while counsel for plaintiff in error concede that this is true, but most earnestly insist that the instructions are not applicable to the facts and circumstances of this case, and therefore were calculated to mislead the jury.

The problem whether or not an instruction might have misled the jury in a particular case, is perhaps one of the most difficult that an appellate court is called upon to solve.

In the case of *Blankenship* v. *C. & O. Rwy. Co., supra,* the injury was to an infant of tender years, inflicted under circumstances that placed him in the category of a licensee, while in the case before us, the plaintiff's intestate, although a licensee, was of more mature years, and a greater degree of care on his part was required than from an infant only ten years of age. Therefore the two cases are differentiated in this respect at least.

In the case of *Kimball & Fink, Receivers,* v. *Friend's Adm'r,* *supra,* Friend, the deceased, met his death in a collision with an engine and tender of the N. & W. R. R. Co. at a crossing in one of the public streets of the city of Roanoke, he being at the time on his bicycle, travelling the street which crosses the railroad at the point of the injury at right angles, and had a right equal to that of the railroad company to the use of the crossing, only restricted in the exercise of this right by the duty imposed upon him to exercise ordinary care to avoid, for his own safety, coming into contact with engines and trains of the railroad company frequently passing over the crossing. Moreover the railroad company had erected some years before, immediately east of the crossing, on the north side of the highway, an electric gong or bell to warn travellers of approaching trains, and this gong, directly in front of Friend as he entered upon the crossing, was silent, thereby indicating to him that there was no train approaching the crossing, certainly not within three hundred yards thereof. Therefore it was said in the opinion in that case that the jury had the right to infer that the deceased had placed some reliance upon the fact that the electric gong failed to sound as the engine approached the crossing, and was thereby misled.

It cannot be questioned that a person injured by a railroad company upon a public crossing stands upon higher footing in an action for the injury, than a licensee injured under the circumstances of the case now before us.

The instructions complained of told the jury that the burden of proving contributory negligence on the part of plaintiff's intestate was upon the defendant company, without any sort of qualification or suggestion to them even, that if negligence on his part contributing to his injury was disclosed by plaintiff's evidence, or could be fairly inferred from all the facts and circumstances of the case, he could not recover. It is true, this arises by implication from all such instructions, but it would be far better for the instructions to state the law plainly and more

fully so that the jury could not be misled, especially in cases, as in this, where the evidence of the plaintiff tended, at the least, to disclose his intestate's contributory negligence, and the circumstances of the case were such that such negligence might be fairly inferred therefrom.

Say Shearman & Redfield in their work on Contributory Negligence, Vol. 1, p. 179, "In all courts, where there is any evidence from which an inference of contributory negligence might reasonably be drawn, the court must instruct the jury that the plaintiff cannot recover if his negligence contributed to produce the injury, in the manner hereinbefore stated;" that is, by the want of ordinary care on the part of the plaintiff or his intestate, to avoid injury.

The rule that contributory negligence is a matter of defence, and that the burden of establishing it is upon the defendant, obtains in the Supreme Court of the United States, and in the courts of many of the States of the Union, Virginia included, but, in all these jurisdictions, where contributory negligence is held a matter of defence, whenever the plaintiff's own case raises the presumption of contributory negligence, the burden of proof is immediately upon him. In such a case it devolves upon the plaintiff, as of course, to clear himself of the suspicion of negligence that he himself created. He must make out his case in full, and where the circumstances attending the injury were such as to raise a presumption against him in respect to the exercise of due care, the law requires him to establish his freedom from contributory fault. Beach on Con. Neg., Revised Edition by Crawford, secs. 426-7, and authorities cited, among which is *Kimball & Fink, Receivers,* v. *Friend's Adm'r, supra,* wherein it was said—citing *Balt. & O. R. R. Co.* v. *Whittington,* 30 Gratt. 805; *Improvement Co.* v. *Andrew,* 86 Va. 273; *N. & W. R. R. Co.* v. *Gilman,* 88 Va. 239—" The burden of proving contributory negligence on the part of the plaintiff is on the defendant,

unless it is disclosed by the plaintiff's evidence, or can be fairly inferred from all the circumstances of the case."

It is conceded that plaintiff's intestate, when upon company's right of way where he was killed, was there as a licensee, whereby the company was charged with the duty of taking reasonable care to avoid injury to him, but it was a duty resting upon the deceased also to take ordinary precautions for his own safety, even if there was negligence on the company's part. *N. & W. R. Co.* v. *Wilson,* 90 Va. 265, and authorities there cited.

The question to be determined in every case of this character is, not whether the plaintiff or plaintiff's intestate's negligence *caused,* but whether it *contributed* to the injury of which complaint is made. . Shearman & Redfield on Neg., secs. 87 and 96.

This brings us to the remaining question in the case, arising under the assignment of error to the refusal of the court below to set aside the verdict of the jury because contrary to the law and the evidence, which is to be determined in the light of the well established principles already adverted to; and though it is conceded that the customary use of the defendant company's right of way by pedestrians at the place where plaintiff's intestate lost his life, proved the implied assent of the defendant company to such use, and placed him in the position of a licensee, it cannot be lost sight of that this did not relieve him from the duty of exercising care to protect himself from the obvious dangers of his situation.

The allegations of negligence against the defendant company are that the servants of the company did not give notice of the approach of the train either by whistle or bell; that it was running too fast, and that the engineer had taken his eyes off the track before him, whereby he failed to see plaintiff's intestate's peril as soon as he might have seen it by the exercise of due care.

The evidence is conflicting as to the speed of the train, as is usual where the casual observers of the train as it passes testify

as to its speed on the one side, and those in charge of the movement of the train on the other, but it may be said that the concurrence of the evidence fixes the speed of the train at from eighteen to twenty miles per hour. There was no ordinance limiting the speed of trains in the corporate limits of the city of Danville. The only evidence in the case tending to prove that the engineer was not observing the track in front of him, is given by a witness who says he was standing in the tower of the cotton mills, on the third floor, and observed the train just as the engine came off the trestle, saw the engineer only at a glance, and he seemed to be looking at the cotton mills below where witness was standing; but, when it is recalled that the front of the engine at this point was directly towards the cotton mills, this evidence has but little weight in support of the allegation that the engineer had taken his eyes off the track, whereby he failed to observe the deceased on the track as soon as he might have done. There is conflict in the evidence, even among plaintiff's own witnesses, as to the number of times and where the whistle of the engine was blown. One or more of them say it blew as many as four times before it struck deceased, though at short intervals.

It is testified to by the engineer, a competent and efficient employee of the defendant company, running the engine that struck Bruce, the deceased, corroborated by his fireman, and not controverted by the evidence of the plaintiff, that he saw deceased as soon as his engine came off the sharp curve and aligned itself with the track on which deceased was walking, or upon which he had just stepped, and, allowing only an instant after sounding the whistle, for him to get off the track, as he had a right to assume that he would do, all the appliances on the engine that could be used for that purpose, with safety to the passengers aboard the train, were put in use, but the train could not be stopped, and ran on some distance beyond the point of the accident. Moreover, it is shown by an experienced and efficient engineer, an employee of another railroad company, called in

for the purpose, that he ran a train made up as to engine, number and character of cars as the one run by the defendant company on the occasion of this accident, from a point north of the signal post, and beyond Henry street, and at a speed of fifteen miles° per hour, a torpedo having been placed upon the track at the point from which Bruce was or could have been seen from the engine, and that the train could not be stopped before reaching the point at which Bruce was struck, but ran down below, stopping with the rear end of the train not very far from the point at which the rear end of the train on the occasion of the accident stopped. No effort is made to show that the train killing deceased could have been stopped after his peril was discovered, or might have been discovered by ordinary care on the part of the engineer; but the contention is that, because this was the case, owing to the rate of speed at which the train was running, it was, under the circumstances, such negligence on the part of the defendant company as entitled the plaitiff to recover in this action. Conceding, however, that the defendant company was guilty of negligence contributing to cause the death of the deceased, (though it cannot be conceded as gross negligence, as is contended for by defendant in error,) the question, whether or not plaintiff's intestate exercised the ordinary care required of him to protect himself from the obvious danger of the situation he had placed himself in when he was struck by the engine and killed, remains yet to be determined.

As we have seen, plaintiff's intestate came down the railroad track over or under the trestle of which mention has been frequently made, passed around the sharp curve in the road under the high embankment lying within the curve, and proceeded down the track, whereby he put himself in a position to be unable to see a train approaching from that direction. He heard the noises around him, whereby the hearing of an approaching train was rendered more difficult, yet instead of pursuing his journey upon a convenient, safe and suitable walkway between the rail-

road track and the fence in front of the cotton mills, he selected the railroad track, itself admonishing him of danger, to walk upon, never looking back or stopping apparently, or listening for a train. Under these circumstances, there was no excuse for his failure to adopt such reasonable precautions to prevent injury to him. 7 Amer. & Eng. Enc. Law (2d ed.), 435, and the authorities there cited.

From the end of the trestle to where deceased was overtaken by the engine was about 150 yards, and from the steps coming down from Pickett street to the railroad track, about 103 yards, as appears from plaintiff's evidence, and to these steps, at least from below where the accident occurred, was an unobstructed view.

Two witnesses who claim to have seen the deceased upon the railroad track when struck by the engine were introduced by the plaintiff—a Mrs. Irby, and one John Waters, colored—and there is a singular conflict in their statement as to where the deceased was walking. Waters says he was walking in the middle of the track, while Mrs. Irby says he was walking on the ends of the cross ties, on one side of the track, and she was walking on the ties nearly opposite to him, she going in the direction the train was coming, and he from it. Waters further says that when he got down to the railroad bank he looked up and saw the train just after it came off the trestle and noticed a man (deceased) before the train, and he did not seem to pay any attention to the train at all, and while witness noticed him he walked on and never paid any attention to the train, and the train came on and just about the time it struck him it blew the whistle; that witness came to the railroad from the east, heard the roar of the train 150 yards off before it came in sight, and saw it, as soon as he got to the railroad, coming off the trestle; that witness was about 150 yards from the man when he saw the train and the man fifty yards in front of the train; that the whistle blew a

minute or two before the engine struck the man, but indicated the space of time between the blast of the whistle and the striking of the deceased by a clap of the hands. When asked whether in that time deceased could have gotten off the track, he answered: " No sir, I do not think he could have, for the man had not even looked around or looked up to see if the train was coming." When asked, if he heard the train when more than 100 yards from it, why the man nearer to the train did not hear it, witness said he could not tell. He further says that he was the only person there besides the deceased, and knows that Mrs. Irby was not there, but in the latter statement he is discredited by other witnesses.

The statement of Mrs. Irby is that deceased was nearly opposite her on the ends of the railroad ties from which he could have reached a place of safety by a single step; that she saw the train just as it blew about ten yards behind deceased; that seeing no way of escape for her she said: " Lord have mercy I will be killed "; and made her escape up on the bank in a little washed place, where she clutched some weeds or grass, and held her clothes down to prevent being drawn under the train as it passed, and from which position she saw the engine strike deceased. When asked why he did not hear the train, too, her reply was: " I reckon it was the noise of the mill." On cross-examination she said the blow or " squeal " of the whistle, as she described it, was a moment or two before deceased was struck, and admits that she saw the train as it came around the curve of the hill, fully 135 yards above her; that she saw other persons on the track nearer the train than she or deceased were, who found out the train was coming, and got out of the way of it. When suggested to her that she might have told the deceased the train was coming, she said she had only time to holler " train " and fall out to one side, yet says that when she was up on the hillside where she had to hold on to some weeds or grass to keep

from being drawn under the train, she saw the man killed right opposite to her and indicates just how he was carrying his umbrella in his hand, wrapped up, and just where the engine struck him on his shoulder and skull. This witness testifies with apparent sincerity as to the speed of the train, and the distance it was from deceased when the alarm whistle was sounded, still her story, accepted as true, discloses the fact that she, a women nearly sixty-nine years of age, had time to get off the track and up on the embankment to a place of safety before the engine struck him, and in time to be able to state with particularity how he was carrying his umbrella, and where he was struck by the engine.

It will thus be seen that while others saw or heard the train coming, when nearer the sharp curve in the road than deceased, and Mrs. Irby made exclamations about the train coming within six or eight feet of him, deceased neither looked nor listened for the train, nor paid any sort of attention to the exclamations or actions of Mrs. Irby, which he was bound to have heard and seen, had he not been so engrossed in thought upon other matters that he was oblivious of what was going on around him, and that too when he had needlessly placed himself in a position of danger by walking upon the railroad track when he could just as well have walked in the open space by it where he would have been safe. The track itself warned him of danger. He was conversant with the railroad track and its surroundings as far back as the point at which he came upon it, and must have observed the obstructions to the view of approaching trains from that direction. He heard the noise of the mills he was passing, and heard the roar of the waters over the falls in the river near by, which admonished him to look and listen more carefully for the trains constantly passing than would have been required under other conditions. Yet he pursues his journey upon the railroad track with his thoughts evidently fixed upon some other subject than that of his own safety, or the dangers of his surroundings.

Vol. xcvii—14

In *N. & W. R. Co.* v. *Wilson, supra,* it was held that one crossing a railroad at a place where the public is licensed to cross, who knowing that he is on one of the main tracks over which trains pass at all hours, fixes his attention upon a train on the other track which he has changed his course to avoid, and takes no precautions in looking out for trains upon the track on which he is walking, is guilty of such negligence as defeats his recovery for injuries from being struck by such train.

It was said by Lewis, P., in that case, that, as Wilson was licensed to cross the railroad track where he was injured, it was imposed upon the defendant company as a duty to exercise reasonable and ordinary care to avoid injuring pedestrains crossing at that point. But the plaintiff was, nevertheless, bound to take ordinary precautions for his own safety, and the necessity for his doing so was not relieved by negligence, if there was any, on the part of the company. It was his duty to listen, and to keep a constant lookout for approaching trains, to make sure the track was safe; and, had he exercised the vigilance the rule in such a case requires, instead of fixing his attention on the west bound train after he had changed his course to avoid it, he would not have been injured. It is unnecessary, therefore, to decide whether or not the company was negligent, for, be that as it may, the negligence of the plaintiff defeats a recovery.

The question whether or not the negligence of plaintiff's intestate contributed to the injury was of course to be submitted to the jury under proper instructions, but if such negligence is disclosed by the plaintiff's evidence, or is clearly shown by all the circumstances of the case, a verdict for the plaintiff cannot be sustained. *Kimball & Fink, Receivers,* v. *Friend's Adm'r, supra,* and authorities cited.

We are of opinion that the negligence of plaintiff's intestate contributing to his injury must not only be inferred from all the circumstances of the case, but such negligence is apparent from plaintiff's evidence. Therefore the judgment of the Cor-

poration Court of the city of Danville must be reversed and annulled, the verdict of the jury set aside, and the cause remanded to that court for a new trial to be had in accordance with this opinion.

*Reversed.*