## Richmond.

HUMPHREYS' ADM'X v. VALLEY RAILROAD COMPANY.

December 4, 1902.

1. APPEAL AND ERROR—*Two Trials Below—How Case Heard on Writ of Error.*—Where there have been two trials in the lower court, and a verdict for the plaintiff on the first trial has been set aside as contrary to the evidence, and the plaintiff fails to introduce any evidence on the second trial, and there is judgment for the defendant, and the plaintiff obtains a writ of error from this court, based upon a bill of exception to the action of the trial court in setting aside the first verdict, the only question for the consideration of this court is the propriety of the action of the trial court in setting aside the first verdict, and upon such consideration the case is not heard as upon a demurrer to the evidence.

2. VERDICTS—*Against Evidence.*—The verdict of a jury is entitled to great respect, and should not be set aside even by the trial court, unless plainly against the weight of the evidence.

3. NEGLIGENCE—*Contributory Negligence of Plaintiff.*—If the proximate cause of a plaintiff's injury is his own negligence, concurring with the negligence of the defendant, there can be no recovery.

4. RAILROADS—*Trespasser on Track—Negligence—Case at Bar.*—A railroad company owes no duty to a trespasser on its track except to do all that can be done consistently with its higher duty to others, to save him from the consequences of his own negligence after his peril is discovered. If he would recover he must show that the company, by the exercise of ordinary care and diligence, could have avoided injuring him after it discovered his peril. In the case at bar, the deceased was killed at a point where the view of the track was unobstructed for several hundred yards. He had been walking on the heads of the ties a short distance, and stepped between the rails when the train was not over thirty yards from him, and continued to walk down the track. The engineman then used proper efforts to avoid injuring him, but his efforts were in vain. Under such circumstances there should be no recovery against the company.

5. RAILROADS—*Persons on or Near Track—Presumption as to Sight and Hearing.*—In the absence of any evidence to the contrary, an en-gineman in charge of a railroad train has the right to presume that an adult person is of sound mind, in the possession of the ordinary human faculties, will exercise reasonable care and prudence to avoid danger, and will not get on the track or go so near thereto as to be in danger of passing trains, without looking or listening to ascertain that he can safely do so, or, if actually on the track, will get off in time to avoid injury. The engineman may act upon this presumption until it becomes apparent to him, as a man exercising ordinary prudence, that the presumption is not well founded.

6. EVIDENCE—*Negligence—Burden of Proof—Probability of Negligence.*—In an action to recover damages for an injury inflicted through the alleged negligence of the defendant, the burden is on the plaintiff to prove the negligence alleged, and the evidence must show more than a mere probability of negligence. It is not sufficient that the evidence is consistent equally with the existence or non-existence of negligence. There must be affirmative and preponderating proof of the defendant's negligence.

Error to judgments of the Circuit Court of Augusta county, rendered December 21, 1900, and May 14, 1901, in an action of trespass on the case, wherein the plaintiff in error was the plain-tiff, and the defendant in error was the defendant.

*Affirmed.*

The opinion states the case.

*Curry & Glenn* and *A. C. Braxton*, for the plaintiff in error.

*J., J. L.*, and *R. Bumgardner*, for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

Emma J. Humphreys, Administratrix, brought her action in the Circuit Court of Augusta county against the Valley Rail-road Company for the recovery of damages by reason of the death of her intestate, William A. Humphreys, which she al-leges was caused by the negligence of the defendant company.

At the November term, 1900, the case was tried by a jury

which rendered a verdict in favor of the plaintiff for $4,600, and, upon motion of the defendant, the verdict was set aside as being contrary to the law and the evidence. At the May term, 1901, the case was again tried, and, no evidence being offered by the plaintiff, a verdict was rendered in favor of the defendant, upon which the court entered judgment. At the first trial the plaintiff took only one bill of exception, and that was to the action of the court in setting aside the verdict and awarding a new trial. Therefore, the only question for our consideration now is the propriety of the court's action in setting aside the first verdict. *Marshall* v. *Valley R. R. Co.,* 99 Va. 798; *Chapman* v. *Real Est. Inv. Co.,* 96 Va. 177.

· The deceased was a man 67 years of age, active, energetic, in good health, of ordinary intelligence, in possession of the senses of sight and hearing; "a little deaf, but could hear an ordinary conversation." For three years prior to the accident out of which this suit arises, and which resulted in injuries to him from which he died in a few days, the deceased had lived within about 300 yards of the place where the accident occurred, in full view of the railroad, and of the surroundings of the place of the accident.

The train which struck the deceased was a scheduled freight train, with passenger coach attached, made up with the engine and tender, twelve loaded cars, one empty, and the passenger coach, and reached Verona Station, where the accident occurred, about fifteen minutes behind its scheduled time. On the afternoon of the day of the accident, October 17, 1899, a bright, clear day, the deceased left Staunton and drove in an open one-horse surrey, with his wife, along the Valley Turnpike, which for a considerable distance south and towards Staunton from Verona Station is near to, and nearly parallel with, the Valley railroad. On reaching the point where the road upon which the dwelling of the deceased is situated, and which crosses the railroad at Verona Station, intersects the turnpike, he turned into

the road leading to his dwelling. From the point where the turnpike and the road from the turnpike to decedent's dwelling intersect, the Valley railroad is in plain view, and the view of it is unobstructed from every point on the road into which the deceased turned, from its intersection with the turnpike to its intersection with the railroad, except a partial obstruction for a short distance by a house standing on the corner at the inter-section, and a small stable near the railroad. The deceased drove from the turnpike across the railroad, stopped just beyond or east of the railroad track, at a point where the rear end of his surrey was about nineteen feet from the center of the railroad track. While he was driving from the turnpike to the railroad crossing, William Harris, in a two-horse wagon, was driving the same road, meeting him, and in plain view of him, "whipping his horses across the track." Harris stopped immediately at the corner of the depot, very near the track and the crossing, and just as he "stopped and was tying his lines in order to get out and stand at his horses' heads," the deceased drove by towards the railroad, "hurrying his horse up." At that time the train was approaching in full view of Harris, and necessarily so to the deceased, if he looked at all for an approaching train. After stopping on the east side of the railroad track nineteen feet from it, as stated, the deceased got out of his surrey, on the right or south side, in the direction from which the train was approach-ing, and, according to plaintiff's witnesses, walked back to the railroad track at a point a few feet from the crossing, turned down the track toward the depot, walking on the ends of the ties a short distance, and then stepped over inside of the track, and after taking five or six steps was struck by the engine; but, according to defendant's witnesses, after getting out of his surrey to the right, facing the approaching train, the deceased walked diagonally to the railroad track, as if he was going directly across the track to the door of the store in the depot, and had gotten but one foot on the track when he was struck by the en-

gine.    The distance from the surrey to where deceased was
struck, the nearest diagonal route, is about sixty feet, and from
the crossing to where he was struck is about forty-five feet.
When he got upon the ends of the ties near the crossing (if the
plaintiff's view that he got on the railroad at that point be cor-
rect) the train was forty or fifty yards only from him.    There
were a number of persons at and around the depot when the ac-
cident occurred, and all of them saw the approaching train for
some distance before it got near the crossing, the track being
straight, and the view of it being unobstructed for 700 or 800
yards.    One or more of these persons, seeing his danger, threw
up their hands and yelled to deceased to warn him of the ap-
proach of the train.    His wife, whom he had just left, seeing
that he was continuing on the railroad track, or about to step
upon it, in front of the approaching train, attempted to warn
him of his peril by "screaming" to him, but he either did not
hear or see any of these warnings, or disregarding them, con-
tinued toward the store door in the depot for the purpose of get-
ting his mail.

With the exception as to the route taken by the deceased
from his surrey to the point at which he was struck by the en-
gine, the foregoing facts are not controverted.

Verona Station was not a regular stopping point for the train
in question, but it stopped there only on signal to put off or to
take on passengers or freight, and, according to the evidence
given by all of the defendant's employees on the train, the
whistle was blown at the whistling post a few hundred yards
south of the station, and the signal for stopping the train at the
station, given by the conductor from the passenger coach through
the two brakemen on the train and the fireman to the engine-
man, was answered by two short blasts of the whistle; and this is
corroborated by other witnesses in the vicinity, in full view of
the train, and but a short distance away, one of them watching
the train from a window.    On the other hand, some of the

plaintiff's witnesses say they did not hear the whistle, while others say that the whistle was not blown, nor was the bell rung.

The plaintiff, the wife of the deceased, rested her case upon her own evidence, that of her daughter, Mrs. Dunsmore, who was about 300 yards from the railroad, and one Faidley, who was standing at the store door facing the depot platform.

It is too well settled to require citation of authority that, if the proximate cause of the plaintiff's intestate's death was his own negligence concurring with the negligence of the defendant, there can be no recovery, and in the able argument of her case here it is frankly said: "It is fully conceded by the plaintiff that Humphreys was negligent by being on the track, without looking and listening for the train." This would have been true if the deceased had been struck at the crossing, but, as we have seen, he was struck at a point on the defendant's track where he had no right to be, whether he got on the track near the crossing and walked down it, or stepped on it in front of the engine, and was there without taking any precautions for his own safety, for it is conclusively shown that if he had looked or listened for an approaching train, as it was his imperative duty to do, he would have known of the approach of the train which struck him, in ample time to have kept out of all danger of being struck by it. He was, therefore, a naked trespasser, and the defendant, notwithstanding it may have failed to give warning of the approach of the train, owed him no duty, save and except to do all that could be done, consistently with its higher duty to others, to save him from the consequences of his own negligent act, after his peril was discovered, regardless of whether he was guilty of contributory negligence or not. *Seaboard, &c. R. R. Co.* v. *Joyner,* 92 Va. 354, and authorities cited. See also *Wood's Case,* 99 Va. 156, and authorities cited.

In considering the question whether or not the defendant has been guilty of such negligence in this respect as to render it liable for damages, it is to be borne in mind that the case is not

before us as upon a demurrer to evidence, since the trial judge set aside the verdict. It is also true that the verdict of the jury is entitled to great respect and should not be disturbed, even by the trial court, unless plainly against the weight of evidence. *Marshall* v. *Valley R. R. Co., supra.*

The contributory negligence of the deceased having been established, in fact conceded, the burden of proof was immediately placed upon the plaintiff to establish that the defendant, by the exercise of ordinary care and diligence, could have avoided injuring him after it discovered his peril. *Southern Rwy. Co.* v. *Bruce,* 97 Va. 93, and authorities cited; *Washington & Southern Rwy. Co.* v. *Lacey,* 94 Va. 460; *Seaboard, &c. R. Co.* v. *Joyner, supra.*

Very shortly after the deceased left his surrey he was concealed from the view of Mrs. Dunsmore by a pile of ties on the side of the railroad, and—the horse to the surrey in which the plaintiff was sitting having taken fright at the train, and run off—Faidley is the only witness examined for the plaintiff who claims to have seen the whole occurrence.

Faidley, a stranger in that locality, by occupation a painter, happened to be in the neighborhood on the occasion of this accident, and drove to Verona Station in a buggy, hitched at the back porch to the west of the railroad track, and walked through the store to the door facing the railroad. His statement is: "I seen this train coming, but in the first place, I saw the old man get out of the buggy, come behind the buggy, between the buggy and the track, and walk to the track, and step on the track. It looked to me like he was going to cross over, about three feet the other side of the crane, between the crane and the crossing. He stepped upon the end of the ties, walked down about even with the crane, I suppose, and stepped over inside the track, half bent over, looking down neither to the right nor to the left, and I seen the train coming. I reckon . . . it

was forty or fifty yards from the old man when he stepped upon the ties, when he first stepped upon the ties." He further says that Humphreys, after taking three or four steps upon the ties, then stepped over on the inside of the rail, the east rail, "looked like he sorter blundered, walked stiff; that the train was approaching very close then, and after taking five or six steps the train struck him, and that he (witness) did not think that Humphreys was in any danger when the train was forty yards from him"—that is, when he stepped upon the end of the ties, about three feet from the crane, which is twenty-eight feet from the point where he was struck. So that, when the witness thought the deceased was in any danger the train was necessarily nearer to him than forty yards, running on a down grade of not less than four or five feet to the mile, and at a speed of at least eight or ten miles per hour, according to the weight of the evidence.

The engineman in charge of the train, shown to be a competent and efficient employee, upon seeing the deceased leave his surrey and start towards the track, was entitled to presume that he was a person of sound mind, in possession of the ordinary human faculties, would exercise reasonable care and prudence in avoiding danger, and would not get on the track, or go so near to it as to be in danger from the passing train, without looking or listening to ascertain that he could safely do so; and, if actually on the track, would get off of it in time to avoid injury. He (the engineman) was entitled to act upon this presumption, until it became apparent to him, as a man, exercising ordinary prudence, that the deceased was about to get upon the track or dangerously near to it, or would keep on the track, without taking the precautions required of him for his own safety. This is conceded to be the general rule, with the qualification that, "if there is anything about the appearance of the person or other circumstances, indicating to the engineman that such person is not conscious of the danger," the rule does not apply.

While this qualification is, in the abstract, proper, there is nothing whatever in the evidence to show that the appearance of the deceased was such as to indicate to the engineman that he was not conscious of his danger.   Faidley says that he was walking "tolerably quick," or "going along at a pretty good lick."   True, some of the witnesses say that "he was limping, walking all bent up, with his head down"; that he seemed "to be bewildered"; "it looked like something was wrong," and that the railroad hands who were at the depot in front of the deceased, waved their hands and shouted to him, but none of them say that these things were apparent to the engineman. These witnesses being within a short distance only of the deceased, it cannot be assumed that what was apparent to them was also apparent to the engineman on the train.   Besides, the throwing up of hands and "shouting" to the deceased necessarily did not take place until it was apparent to the witnesses that he was in danger, and, according to Faidley's view, he was in no danger until the train was near to him, certainly much less than forty yards, and, in fact, to use the witness' own words, "the train was approaching very close."   Therefore, these circumstances do not warrant the application of the qualification of the rule of law just stated.

With the view of stopping the train at the depot to put off passengers, the air-brakes had already been applied, and the speed of the train reduced, according to plaintiff's witnesses, to eight or ten miles per hour.

The statement of the engineman is that when approaching the crossing he realized that the deceased was getting in danger, and reversed his engine, put the air on full, put sand on the track, and gave the engine steam to resist the speed of the train.   The train was on a down grade, and, the appliances for stopping it having been put in use, it was drifting.   He then explains that, the air-brakes having been applied for the stop at the depot as was intended, the emergency brake could not be applied with as

much effect; that he could not reverse his engine, put the air on full, and sand the track, and at the same time sound the alarm whistle. According to his view, the means he used were far better calculated to give the deceased a chance to escape injury than sounding the alarm whistle. This statement of the engineman, as to his efforts to stop the train, is corroborated by all the employees on the train. The only variance between their statement and his is, the fireman says that the engine was reversed, and the sand put on at the cattle guard a little south of the crossing. The four expert enginemen examined, two of whom were called by the plaintiff, concur in stating, in substance and effect, that, after it became apparent that the deceased was, or likely to be, in danger, it was impossible to stop the train before it struck him, and the only criticism they make of the action of the engineman was his failure to sound the alarm whistle, but none of them undertake to say that that would have had the effect of causing the deceased to keep off the track, or to get off if he was already on it. Some of them do say that it usually has that effect, but this is entitled to little or no weight, since the plaintiff's witness, Faidley, who saw the whole occurrence, says "that if he (deceased) could have seen at all, he would have seen the train." Therefore, he knew the train was coming, and if it was his purpose, as would seem to have been the case, to continue on the track until he reached the point where he intended to get off, or to cross over the track before the train reached him, it is not at all probable that the alarm whistle would have changed his purpose.

The statement of the engineman, corroborated as before stated, that he did everything in his power to stop the train when he realized that the deceased was in danger, or about to get in danger, is alone controverted by the statement of the witness Faidley, who was standing at the store door, in front of which deceased was struck, watching at the same time the deceased and the train approaching, directly in line of his vision;

and he undertakes to say that the engine was not reversed, the air put on, nor the track sanded until deceased was struck. In that position it was impossible for Faidley to know from observation what was being done on the engine, and the only grounds upon which he could claim to be an expert were that, years ago, before air-brakes were used on a train like this, he worked five years as brakeman on a freight train, and three as fireman. Moreover, circumstances to which he and others testify do not bear out this theory of his. The deceased was struck in front of the store door, where Faidley was standing, and carried a few feet only, on the cow-catcher, when he rolled off to the right. Only five or six of the fourteen cars in the train passed Faidley before the train stopped, and when it stopped he, as well as others, walked over from the depot platform on the narrow platform between the freight cars, and looked down at deceased, lying but a few feet nearer the engine than they were; and, although the train was to stop to put off passengers, the passenger coach was standing when it stopped south of the platform, which shows unmistakably that the efforts made by the engineman to stop the train were made before it struck deceased, notwithstanding the opinion of the witness, Faidley, to the contrary.

It is claimed, however, that defendant's witness, Peters, says that the train did not stop "a bit quicker than it would have stopped anyhow"; that if the deceased had reached the point of collision "a second earlier, or the train a second later," the accident would not have happened. Conceding that the witness is correctly quoted, what he says is to be interpreted in the light of all that he says, and it is to be borne in mind that he was testifying from the point of view of himself and eight or nine other witnesses, that the deceased approached the track diagonally from his surrey, bent on crossing it before the train reached him; and therefore, the witness meant that if the deceased had been a second earlier, or the train a second later, he would have ac-

complished his purpose. What the witness says is directly opposed to the statement of the witness, Faidley, that the efforts to stop the train were made after the deceased was struck, and corroborates the engineman in his statement that he was doing all he could to stop it.

In no view that can be taken, even of the plaintiff's evidence alone, aided by just inferences to be drawn therefrom, can it be reasonably claimed that the deceased should have been regarded by the engineman as being in a position of danger until he stepped over between the rails, and continued to walk down the track. Then the train was not over thirty yards from him, and, according to the witness, Faidley, claiming experience in such matters, it required fifty yards by sanding the track to stop it.

Stress is laid upon the statements of Barrett and Denton, expert enginemen, introduced in rebuttal by the plaintiff, as to what effect upon the deceased the sounding of the whistle would have had. The sum and substance of what the second-named witness says is in answer to the question: "In your opinion, if the whistle had been sounded, what would have been the result?" and his answer is: "Well, sir, I could not say; I am no prophet; but it naturally would call the man's attention, if he is not deaf and dumb, and would cause him to step off to one side or the other. I don't know what would have been the circumstances in this case. This is a very natural thing to suppose. That is what the whistle is there for."

The witness, Barrett, after stating that his experience had been that when a person was on the track and the whistle was sounded, he would jump to one side of the track, was asked: "Do you think that on that occasion, under those circumstances, if the whistle had been sounded, the man would have jumped off?" and his answer was: "I am not a prophet, but I think he would." It is manifest that these answers of the witnesses are predicated upon the deceased being upon the track, and not knowing of the approach of the train. But, as we have seen, all

the witnesses agree that the deceased was bound to have seen the train, if his thoughts were not fixed upon some other subject than that of his own safety, or the danger of his surrounding. Faidley says: "If he could have heard at all, he would have heard or seen the train." And again, "If he could have seen at all, he could have seen the train."

The witness Barrett also says: "In the case that gentleman was in, I mean the engineer, I believe he did everything he could to stop. I believe that he gave a fair, square statement, and that he did everything that he could do, except sounding the alarm whistle." The utmost to which this witness goes as to whether the train could have been stopped before it reached deceased is that if the train, at the crossing, was going at four or five miles an hour, and the engine in perfect condition, "it would have stopped about where it struck the man," but "if it was going at eight miles, it would have gone much farther."

From the uncontradicted proof, the conclusion cannot be escaped that the deceased knew that the train was approaching, and under these circumstances, even if the expert witnesses had said that the sounding of the alarm whistle would have caused him to have gotten off the track, it would have been nothing more than conjecture. The omission to sound the alarm whistle does not constitute such negligence on the part of the defendant as to justify a recovery in this case, unless it is shown that such omission was the proximate cause of the injury complained of.

"In an action to recover damages for an injury inflicted through the negligence of the defendant, the burden is on the plaintiff to prove the negligence alleged, and the evidence must show more than a mere probability of negligence. It is not sufficient that the evidence is consistent equally with the existence or non-existence of negligence. There must be affirmative and preponderating proof of the defendant's negligence." *N. & W. Rwy. Co.* v. *Cromer*, 99 Va. 765. In that case, it was held that the trial court erred in refusing an instruction which told

the jury "that the burden of proof is on the plaintiff to prove negligence, and that the proof must amount to more than a probability of a negligent act; that the verdict cannot be founded upon conjecture."

In *Southern Railway Co.* v. *Bruce*, 97 Va. 92, Bruce, the deceased, was a licensee walking upon the track of the defendant company, and it was contended, as in this case, that the failure to sound the alarm whistle after the deceased had been seen, or ought to have been seen, by the engineman in charge of the train, to be in a perilous position, rendered the defendant company liable in damages; but the contrary view was taken. It was said in that case that the deceased neither looked nor listened for the train, . . . so engrossed in thought upon other matters that he was oblivious of what was going on around him, and that, too, when he had needlessly placed himself in a position of danger by walking upon the railroad track, when he could just as well have walked in the open space by it, where he would have been safe. The track itself warned him of danger. Being conversant with the railroad track . . . and its surroundings . . . yet pursuing his journey upon the railroad track, with his thoughts evidently fixed upon some other subject than that of his own safety, or the danger of his surroundings, he so contributed to his injury as to preclude a recovery therefor, even if there was negligence on the part of the defendant company.

What was said in that case applies with equal force to the case at bar. See also *N. & W. Rwy. Co.* v. *Wilson*, 90 Va. 263; *Marks* v. *P. R. R. Co.*, 88 Va. 1; *Hogan's Adm'r* v. *Tyler, Receiver*, 90 Va. 19.

Upon a careful consideration of the evidence in this case, the conclusion cannot be escaped that the deceased, going to the store in the depot for his mail, "walking tolerably quick" or "going at a pretty good lick," as plaintiff's witness states it, knew the train was coming, and intended to get off the track, or

to cross it before the train reached him, and simply made a miscalculation as to his ability to accomplish his purpose, and that it was not within the power of the defendant's employees to avoid injury to him after his peril was discovered. And this conclusion must inevitably be reached, though there is left entirely out of view the testimony of a number of witnesses as to declarations made by the deceased shortly after he was injured, to the effect that he knew the train was coming, but did not know it was so near to him; that he would have gotten across if his foot had not slipped, &c., and also the statement of the plaintiff herself, made that evening or the next morning, that she begged him not to try to cross the track, or not to go upon it. She does not deny having made such a statement, but attributes the declaration to nervousness or excitement, and she is only certain that she did not urge her husband not to go upon the track when approaching it in his surrey from the west. Her statement is that after she got home she said that she tried to keep him off the track, but it was when he was going back there after the mail, "I tried to keep him off the track after he started back to go after the mail."

The deceased, by his own negligence and recklessness, directly and proximately contributed to the act which resulted in his death, and we see nothing in the evidence to warrant the conclusion that the employees of the defendant, after his peril was discovered, negligently failed to do all that could be done to avoid the injury to him.

It follows that there is no error in the judgment of the Circuit Court, and it is, therefore, affirmed.

*Affirmed.*