Statement.

# Richmond.

NORFOLK & WESTERN RAILWAY CO. v. DEAN'S ADMINISTRATRIX.

November 21, 1907.

1. RAILROADS—*Personal Injury—Persons Walking on Track—Presumption—Duty of Company.*—The servants of a railroad company, in charge of one of its trains, have the right to assume that a grown person, in apparent possession of his faculties, seen walking on its track, will get out of the way of an approaching train, but when it is apparent that he is unconscious of his danger, it is their duty to do all they can, consistently with their higher duty to others, to save him from the consequences of his own act, regardless of whether he is guilty of contributory negligence or not. If his presence is observed by careful and experienced men operating the train, and they, in the exercise of their best discretion, do not regard him in danger, until, on getting nearer to him, he appears to be unconscious of his peril, and they then do all in their power to prevent an injury to him, though without avail, the company is not liable.

2. DEMURRER TO EVIDENCE—*Doubtful Conclusion.*—On a demurrer to evidence, if there is room for difference of opinion among reasonable men as to the conclusion to be reached, the demurrer should be overruled.

Error to a judgment of the Circuit Court of Tazewell county in an action of trespass on the case.    Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Henry & Graham* and *S. D. May,* for the plaintiff in error.

*W. H. Werth* and *Chapman & Gillespie,* for the defendant in error.

KEITH, P., delivered the opinion of the court.

Dean's Administratrix sued in the circuit court of Tazewell county to recover damages for the wrongful death of her intestate, and filed a declaration containing two counts, to which the defendant company demurred, and the court sustained the demurrer to the first, but overruled it to the second count. Thereupon the plaintiff filed another count, which was demurred to, and the demurrer overruled. A trial was then had, which resulted in a verdict of the jury, subject to the defendant's demurrer to the evidence. Upon that verdict the court rendered judgment in favor of the plaintiff, and the case is before us upon a writ of error awarded by one of the judges of this court.

The circuit court filed a written opinion in support of its judgment, in which it says that the first count in effect charges that the place on defendant's track where plaintiff's intestate was killed, was daily used by a large number of people, which fact was known to the defendant company, and thereby it became and was the duty of the defendant company to keep a lookout for persons on its track, so as to discover and not to injure them; that it neglected this duty, and by reason of this neglect, plaintiff's intestate was killed.

"The second count," continues the court, "avers, in effect, that, after the crew in charge of the defendant company's train had discovered intestate was on the track in front of said engine, and that he was unconscious of his danger, and would take no measure to protect himself from the danger, the said crew in charge of said engine failed to use any measures whatever to prevent injuring plaintiff."

The circuit court was of opinion that there could be no recovery upon the first count, because of the contributory negligence of the person injured, but rests the case solely upon the second count in the declaration, in which the case presented is that, after it became apparent to the crew in charge of defendant company's train that intestate of plaintiff was on the

track in front of the engine, that he was unconscious of his danger and would take no measures to protect himself, the crew failed to use any measure to prevent the accident. Such being the issue to be determined, it is needless to consider so much of the evidence as relates to the use of the track as a public passway, or as to whether or not the person injured was a licensee or a trespasser. He was a human being, and when his dangerous position was seen and known, and that he himself was unconscious of his peril, and would take no measures for his own protection, it became the duty of the railroad company to do all that could be done consistent with its higher duties to others to save him from the consequences of his own act, regardless of whether he was guilty of contributory negligence or not. *Seaboard & Roanoke R. Co.* v. *Joyner's Admr.,* 92 Va. 355, 23 S. E. 773.

This being the narrow issue to be decided, it becomes necessary to consider the evidence bearing upon it with care, and if, as a result of that inquiry, it shall appear that there is room for a difference of opinion among reasonable men, then, in accordance with the decision of the Supreme Court of the United States in *Grand Trunk R. Co.* v. *Ives,* 144 U. S. 408, 36 L. Ed. 485, 12 Sup. Ct. 679, and with *Kimball & Fink, Rec'rs,* v. *Friend's Admr.,* 95 Va. 125, 27 S. E. 901, which have been so frequently followed in this court, the case is one proper for a jury, and the demurrer to evidence should have been overruled.

At the point of the accident, the railway is double-tracked—one track being used by trains moving toward the west, and the other by trains moving toward the east. It was the habit of pedestrians who used these tracks for a pass-way to walk upon them in a direction opposite to that in which trains were accustomed to move, so that the train using the track would be in front of the person upon the track and moving toward him. A man walking west, therefore, would be upon the track used by eastbound trains, while a man going toward the east, would be upon the track used by trains going in the opposite direction.

But, while this was the customary and usual way of moving the trains upon the tracks, it not unfrequently happened that a train going west would be upon the eastbound track, or a train going east upon the westbound track. In other words, the tracks were used at this point as was most convenient in the shifting and movement of trains in order to perform the various duties of the railroad company. Upon the morning of the accident there was. a freight train, consisting of fifty-five or sixty cars, drawn by two engines, moving west upon the .westbound track; and there was a light engine and tender, moving tender in front and also going west, upon the eastbound track. As they approached a bridge over Bluestone river, Dean, the man who was killed, was seen walking upon the eastbound track in front of the tender, and near the west-end of the bridge.

The first witness examined by defendant in error was A. W. Tabor. He did not see the accident, and his evidence bears only upon the locality, which we have endeavored to describe, its use by people and the result of certain experiments which he tried, tending to show how far down the track a man sitting upon the bumper of the tender of the engine that caused the accident, could have seen a man standing on the track; but his evidence is not very material, because, as has been already said, there is no doubt that the train men saw the deceased, and it may be conceded that they saw him at such a distance as that the engine might have been stopped without doing him any injury, if it further appears that he was then in apparent danger and was not likely to take any measures for his own protection.

The first witness for defendant in error who saw the accident was Whitworth. He says that, on the day in question, he was in charge of a coal train that works at Pocahontas at night; that he came to the Flat Top yards and got instructions to take his train to Mullin's siding, which is about a mile toward the east from Falls Mills, the station near which the accident occurred. Having put his train at Mullin's siding, as directed, he

was returning, in accordance with his orders, to Flat Top yards, and was sitting on the back end of the tank, when he noticed a man walking down the track. The engine was moving, it will be remembered, tender in front. The witness, continuing, says: "When I first saw the man, I wasn't thinking about his being run over, and I didn't pay much attention to him until I got closer, and then I hollered, and signaled to the engineer to stop, but it didn't do any good, as he didn't pay any attention to it at all, and we ran over him and killed him." Dean was within two or three steps of being off the bridge when first seen by this witness at a distance of about three telegraph poles, or in the neighborhood of 180 feet. Witness says that he can't say exactly how far the engine moved while he was watching the man; that he was expecting him to step off the track; that it was a matter of daily occurrence that people walked on the railroad track until the engine was in eight or ten feet of them, when they would step off; and that "if we stopped the train every time we see a man on the track, it would take us from now until next Christmas to get to Bluefield;" but that probably it was half the distance between two and three telegraph poles "before I made any alarm, or something like that; I couldn't say exactly." The first signal which he gave to the engineer when he found that there was danger of injury to Dean was what the witness denominates as the "steady" signal—"I didn't wave him down, I just held my hand out." He was then examined rigidly as to what the result of the signal was—as to whether or not the engineer put on the emergency brake; but in reply to this line of examination the witness said, that he couldn't tell whether the emergency brake was put on or not, but that the brake was applied after he had given the signal. It appears further from his testimony that what is known as the "service" brake differs from the emergency brake only in degree—if the full force of air is turned upon the brake, that is an *emergency* brake; in ordinary cases, less than the full force is turned on, and that is the *service* brake. In other

words, there is only one set of brakes, and the difference consists in the amount of air pressure which is applied.

The sum of this witness's testimony is this: That he first discovered Dean upon the track at a distance of about three telegraph poles, or 180 feet; that at the moment of his discovery he did not consider him in danger; that it is a very usual thing for people to walk on the railroad track, and by stepping to the right or left, they reach a place of safety, and that oftentimes this is not done until the train has approached within a few feet; that he had passed over about half the distance which had intervened between him and the man when he first saw him— that is to say, 90 or 100 feet—when he gave the engineer the signal to "steady;" that he couldn't say exactly at what point this signal was given; and that after he had passed over about half the remaining distance, it then appearing to him that the man was in danger, the engineer was given the second signal to stop his engine. It appears that during this time the bell was being rung by the fireman in the cab.

The next eye-witnesses to the accident examined testified on behalf of plaintiff in error, and their testimony is not to be considered upon demurrer to evidence, if it be in conflict with that of the witnesses for defendant in error.

R. B. Fergusson was the engineer in charge of the engine which did the injury. After leaving his train at Mullin's siding, he says, "I was on the eastbound track, going west, and there was a train going west on the westbound track when we struck Dean. We came around a little curve, and the fireman sitting up in the window and ringing the bell. He hollered to to me to look out, or hold her, or something to that effect. I slammed the brake in the emergency, and reversed my engine, and we ran down about a couple of engine-lengths, and he said we ran over a man, and I think we ran about two engine-lengths after he hollered at me before I came to a dead stop, and there was a man laying in the middle of the track." The engineer did not see the man before he was killed. He was running at

the rate of about 15 or 18 miles an hour. He is positive that he put on the emergency brake and reversed his engine at once. Again he says: "I gave her the whole braking power she had. She slid about two engine lengths—I couldn't tell you how far— and the wheels locked.

W. D. Tabor was the fireman on this engine. He says: "I saw some one walking in front of the engine on the track, and I called Mr. Ferguson's attention to it; just as soon as I did, he threw the air in the emergency and stopped as quick as he could. We had done run over the man, though, before he stopped." When witness first saw the man, he was about sixty feet away, and just getting off the bridge on the west end. This witness also states that he was at the time ringing the bell, and had been ringing it for nearly three-quarters of a mile; that the whistle was blown at the crossing above Falls Mills, and was also sounded by the engineer after the fireman called his attention to the man upon the track. Being asked whether there was anything else that could have been done to stop the engine and save the man, he replied: "No, sir." "What was the man doing when you saw him?" A.—"He was walking along the middle of the track and paid no attention, and didn't seem to know we were coming."

Defendant in error relies in great measure upon the statement of the witnesses, that Dean did not seem to be paying any attention. It must be remembered that his back was to the witnesses. They could not see his countenance, and their opinion would, therefore, seem to be of little value. The positive evidence, by the sole eye-witness of the accident, who testified on behalf of the defendant in error, is that he had his eye upon the man; that when he first saw him he did not consider him in danger; that as soon as he felt any apprehension as to the situation, he gave the engineer the signal to "steady," and immediately followed it with the signal to stop; that it was a matter of frequent occurrence to see men walking upon the track and remain upon it until the engine came close upon them.

Reliance is placed by defendant in error upon the fact that the freight train was passing at the time, and that the noise it occasioned prevented Dean from hearing the train approaching him from the rear; but that circumstance would be of value only in dealing with the question of contributory negligence, and not with the duty of the railroad company after it actually saw Dean on the track.

So, too, the custom of the company to run its westbound trains upon the westbound track, and its eastbound trains upon the other track, is of no value in the determination of the precise point in issue here; the sole question being whether or not, after Dean's peril was discovered, the agents of the railroad company did all that was required of them to save him from injury.

There is no conflict of evidence here. If the statement of Whitworth, the conductor, be taken alone, all was done that should have been done under the circumstances of the case. If the emergency brake had been applied at the instant Whitworth discovered the presence of Dean upon the track, the accident would have been averted; but in the honest exercise of his discretion, in the light of his long experience, he did not, at that moment, consider Dean in a position of peril. He appears to have been an intelligent and capable official; and there is no reason to suppose that his conduct was not controlled by an honest purpose to do his duty, or that he did not give the signal to "steady" and then to stop to the engineer as soon as the danger of Dean's position became apparent to him.

If the testimony of Tabor, the fireman, and of Ferguson, the engineer, be looked to (and there seems to be no reason why their testimony should not be considered, being in support and not contradictory of the statements of Whitworth, who testified on behalf of the defendant in error), then the case is all the stronger for the plaintiff in error, for they show very clearly that the accident was due to no failure of duty upon their part, but that, with the light before them, they did all that careful

and reasonable men could have done to save Dean from the consequences of his own temerity.

The law upon the facts, as here presented, is well settled.

In *N. & W. Ry. Co., v. Harman,* 83 Va. 577, 8 S. E. 258, it is said, that "if a person seen upon the track is an adult, and apparently in the possession of his or her faculties, the company has a right to presume that he will exercise his senses and remove himself from his dangerous position; and if he fails to do so, and is injured, the fault is his own, and there is, in the absence of wilful negligence on its part, no remedy against the company for the results of an injury brought upon him by his own recklessness."

The same doctrine is stated in *Tyler, Receiver* v. *Siles,* 90 Va. 539, 19 S. E. 174.

In *Rangeley* v. *Southern Ry. Co.,* 95 Va. 715, 30 S. E. 386, it is said that a railroad company has the right to assume that a grown person seen on its track will get out of the way of an approaching train, and the company is not liable unless it is shown that after the company, in the exercise of ordinary care, could have discovered that he was not going to get off the track, it could have avoided the injury.

And in *Savage* v. *Southern Ry. Co.,* 103 Va. 422, 49 S. E. 484, it is said: "It may be that, had the engineer applied the brakes at the moment he came in sight of Savage upon the track, the accident could have been avoided. But such was not his duty. Seeing a man upon the track, in the apparent possession of all his faculties, the engineer had a right to presume that he would exercise reasonable care for his own protection. A step or two would have placed Savage in a position of safety. The duty devolved upon the engineer to stop the train only when he saw that Savage was in danger—that is to say, when he saw, or ought to have seen, that Savage was himself unconscious of his peril, and would take no measures for his own protection. This proposition has been decided in numerous cases by this court."

The only witnesses whose evidence in this case bears directly upon the point in issue, show that the train men, in the exercise of their best discretion, measured up to the duty imposed upon them by the law.

We are of opinion, therefore, that the demurrer to evidence should have been sustained, and the judgment of the circuit court must be reversed.

*Reversed.*