# Richmond.

## NORFOLK AND WESTERN RAILWAY COMPANY v. OVERTON'S ADMINISTRATOR.

### January 12, 1911.

### Absent, Whittle, J.

1. RAILROADS—*Licenses.*—Where a pathway across a railroad track is used by from sixty to one hundred persons daily, with the knowledge of the servants of the railroad company, one so using the pathway is a licensee, and not a trespasser.

2. INSTRUCTIONS—*Different Theories of Case.*—Where two or more theories of a case are presented by the evidence, the plaintiff has the right to have the theory favorable to him presented to the jury by a proper instruction of the court, especially where the defendant's theory has been presented by instructions given at his instance.

3. INFANTS—*Test of Capacity for Negligence.*—The capacity of an infant between seven and fourteen years is dependent not only upon his general intelligence, but also upon his experience and maturity as well.

4. NEGLIGENCE—*Burden of Proof—Verdict Founded on Conjecture.*— In an action to recover damages for an injury inflicted through the alleged negligence of the defendant, the burden is on the plaintiff to prove the negligence alleged, and a verdict founded upon conjecture and speculation as to what the defendant could, might or ought to have done to avoid the injury complained of will be set aside.

5. RAILROADS—*Persons Approaching Track—Presumption—When Peril Observed.*—An engineman operating a moving train has the right to presume that persons approaching the track, in the apparent exercise of their faculties, will keep out of the way of an on-rushing train in plain view, and when to the engineman there first appears some indication calling for a suspicion of peril, then for the first time arises the duty to take such precaution as may be required by ordinary care to warn and avoid injury to a person in such suspected danger. The failure of an

engineman to anticipate that a person in a place of safety, and apparently in the possession of his faculties, will step on the track immediately in front of a rapidly moving train, in plain view, when there is nothing to indicate such a purpose, does not render the company liable.

Error to a judgment of the Circuit Court of Norfolk county in an action of trespass on the case. Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Hughes & Little*, for the plaintiff in error.

*O. L. Shackleford* and *Daniel Coleman*, for the defendant in error.

Caldwell, J., delivered the opinion of the court.

This action was brought to recover damages for the death of Leroy Overton, an infant thirteen years or more of age, which it is alleged was caused through the negligence of the defendant railway company.

It appears that the place where the fatal accident which is the basis of this suit occurred was a point on the defendant's right of way located in Norfolk county, outside of Norfolk city in the direction of Suffolk, being the point where the defendant's tracks are crossed by the tracks of the Virginian, formerly known as the Tidewater Railroad. At this point the defendant's tracks run approximately north and south, and the Virginian Railroad crosses in a direction approximately northeast and southwest. At this crossing the Virginian has one track and the defendant three tracks, the latter being the regular double tracks of the main line at that point for trains inbound and outbound to and from Norfolk city, together with a siding to the east of the main line.

The defendant's train which struck and instantly killed plaintiff's intestate was the morning express, commonly known as the "Cannon Ball Express."

The plaintiff's intestate was a white boy, about five feet in height, who had resided in Berkley ward of Norfolk city, and had employment in a silk mill in the vicinity of the place of the accident. Near the intersection of the two railroads, west of the defendant's tracks and north of the Virginian's single track, there stands a signal tower, maintained by the Virginian for the purpose of operating the trains of the two roads over this crossing in safety. On the morning of the accident, the "Cannon Ball" train was running on the regular outbound track from Norfolk towards Suffolk, i. e., in a southerly direction, going at the speed of about twenty-five miles an hour, slower than the usual speed of that train, but the speed provided in the regulations for passing this crossing and the interlocking system adjacent thereto, and struck decedent at a point south of the tower. At the time of the accident a freight train of the defendant was passing the point of the accident on the other or inbound track for Norfolk, to the left of the tower and track on which the "Cannon Ball" train was running, viewed from the direction that the last-named train was approaching, and the freight train had just about half passed the point of the accident, so that its middle was opposite the said point. The engineman on the "Cannon Ball" train, who was at his station on the right of his cab keeping a lookout as he approached the crossing, had signals from the tower which showed that the crossing was open for his train, and that he could proceed without stopping. When his engine was approaching the crossing, but some distance away, the engineman saw three boys approaching the crossing along a path leading to the tracks at right angles, on the right side of the tower, which path runs along a line of trees, and it was a very common thing for the engineman to see people, men, women and children, approaching

this crossing as the train neared it, so that there was nothing to cause him to suppose that these boys would go upon the track in front of his on-rushing train.  Soon after the engineman saw these boys in the path walking towards the track in front of his train, they disappeared behind the tower, and when he next saw plaintiff's intestate he appeared from behind the tower, still walking in the direction of the track.  At this time, according to the statement of the engineman when testifying for the defendant in this case, his engine was practically at the tower, but according to plaintiff's witnesses, as we shall see later on, it was some distance away.  There was a system of rods, consisting of small steel rods forming a corduroy surface of 6 feet, 5 1-2 inches, connecting with an interlocking switch equipment, which rods ran parallel to the west rail of the defendant's track, upon which its "Cannon Ball" train was running, and the distance from the nearest rail of the defendant's track to the outer edge of the interlocking switch system was eleven feet.  When the engineman, as he claims, saw the decedent appear from behind the tower, he was then to the right of these rods, so that the situation was such as not to cause him to entertain any idea that the decedent would go upon the track in a position of danger until his first suspicions were aroused by seeing that the boy was in the act of stepping upon the rods, and was looking across the tracks and not towards his train; whereupon he, at this moment of suspicion, rapidly blew four sharp alarm whistles, and simultaneously applied the emergency brake, but it was impossible to check the train at that point, because before the signals had entirely ended the boy had stepped upon the track in front of the train and was struck by the pilot and immediately killed.

Before the building of the Virginian Railway there had been in use for a number of years a neighborhood road extending in a southeasterly and northwesterly direction across the defendant's tracks at the point of this accident, but when

the Virginian Railway was built its roadbed was elevated above the original level, so that the neighborhood road could no longer be used as formerly and was thereafter used only as a pathway for pedestrians going from one side of defendant's tracks to the other. The number of persons using this pathway during the course of a day was by various witnesses estimated at from sixty to one hundred, and this use was known to the servants of the defendant, so that in this case the plaintiff's intestate is to be regarded as a licensee and not as a trespasser upon the right of way of the defendant.

The trial resulted in a verdict and judgment for $2,500 in favor of the plaintiff, which we are asked to review and reverse.

Defendant insists here on its exception taken at the trial to the giving of the seventh and eighth instructions asked by the plaintiff, the exception to the seventh instruction being upon the ground that there was no evidence in the case upon which to base it.

The instruction is as follows: "The court instructs the jury that even though they may believe from the evidence that the plaintiff's intestate, when seen by the defendant's servant, was not then in a position of danger, still if they further believe from the evidence that the said servant of the defendant suspected, or, in the exercise of ordinary foresight, would have suspected from the surrounding circumstances that the plaintiff's intestate was unaware of the approaching train, and was in close proximity to the track upon which said train was running and would likely get into a dangerous position on or near said tracks, and be injured by said approaching train, then it was the duty of the said defendant to exercise ordinary care to prevent injury to the plaintiff's intestate."

We are of opinion that the evidence was not sufficient to justify the giving of this instruction, as we shall see later in this opinion.

Plaintiff's eighth instruction is as follows: "The court in-

structs the jury that if they believe from the evidence that the place at which the accident complained of occurred had been in daily use as a cross-way for pedestrians for a long time by a large number of persons, including women and children, in that vicinity, and that its use was well known to the defendant, it was then the duty of the defendant company to use reasonable care to discover Leroy Overton if on or about to cross the railroad track on which the train was proceeding and in danger at that place, and that if the said defendant did not use such care, and that by its failure so to do the accident occurred, then they must find for the plaintiff's intestate, even though they may believe from the evidence that the plaintiff's intestate was guilty of contributory negligence; provided they believe from the evidence that the servants of the said defendant in charge of its engine did not do all they could, consistently with their own safety, to avoid the injury after the said danger to the said Leroy Overton was known or might have been discovered by the said servants of the defendant by the exercise of ordinary care in keeping a lookout for persons at the place where the accident occurred."

The objection to this instruction is directed at the following language contained therein: " * * * * it was then the duty of the defendant company to use reasonable care to discover Leroy Overton if on or about to cross the railroad track on which the train was proceeding and in danger at that place, and that if the said defendant did not use such care, and that by its failure so to do the accident occurred, then they must find for the plaintiff's intestate, * * * *."

The two theories intended to be presented by this instruction, and which the evidence tended to sustain, were, first, that the engineer's statement to the effect that the cab of his engine had reached the tower house when the deceased stepped upon the interlocking switch system was inaccurate; therefore, if this act on deceased's part took place when the engine was some distance north of the tower, as testified to by plain-

tiff's witnesses, the engineer either did not see it, or if he saw it did not take immediate means of warning the decedent of his danger, wherefore the jury might take this statement of the engineer in connection with the statement of plaintiff's witnesses and reach the conclusion that the engineer did not see the boy in the act of crossing the interlocking switch system, nor until he was about to step on the tracks; that if the engineer saw deceased and his danger, as he stepped upon the interlocking switch system, when the engine was fifty feet or more to the north of the tower, he was negligent in not giving the alarm or trying to stop the train before the engine reached the platform; or if, on the other hand he did not see the deceased until the engine had reached the platform, when according to plaintiff's witnesses the deceased had reached the tracks, then the engineer's negligence consisted in failing to discover deceased crossing the switch system.

We are of opinion that the plaintiff had the right to submit the two theories set forth in the instruction to the jury, especially as the defendant had presented its theory of the case in the seven instructions it asked, and which were given. See the case of *Adamson's Admr.* v. *Norfolk & Portsmouth Trac. Co.*, ante p. 556, 69 S. E. 1055, just decided by this court.

The refusal of the circuit court to give defendant's instruction No. 3, and the giving in lieu thereof the court's own instruction marked No. 3-a, is assigned as error.

The instruction refused is as follows: "It was the duty of the plaintiff to look and listen before attempting to cross the defendant's tracks at any point or points from which he might, by the exercise of ordinary care, have seen or heard the approaching train. And if you believe from the evidence that he might, by so doing, have ascertained the approach of the train in time to avoid the accident, it must be conclusively presumed that he disregarded the rule of law and common prudence and did not look and listen, or if he looked and listened that he went negligently into an obvious danger, if you

believe from the evidence that the deceased was sufficiently intelligent to be guilty of contributory negligence."

The court's instruction No. 3-a is: "If the jury believe from all the evidence that the deceased was a boy capable of knowing the danger of crossing a railroad track upon which trains were frequently passing, then it was his duty to look and listen before attempting to cross the defendant's tracks at any point or points from which he might have seen or heard the approaching trains, and if he failed to use or exercise that intelligence which his age, experience and capacity indicated by failing to look and listen, then you shall find for the defendant."

We think that instruction No. 3, as asked, was defective, in that it confined the test of an infant's capacity for negligence to his intelligence only, while the rule of law that the capacity of an infant between the age of seven and fourteen years for contributory negligence is dependent not only upon his general intelligence, but also upon his experience and maturity, is well settled; therefore the circuit court rightly changed the instruction so that the capacity of the deceased was to be determined not alone by his intelligence but also by his experience and capacity, and this was not unfavorable but favorable to the defendant.

The remaining assignment of error is to the refusal of the trial court to set aside the verdict and award the defendant a new trial, on the ground that the verdict is contrary to the law and the evidence.

The first question presented under this assignment is: Was the evidence sufficient to warrant the jury's finding that the defendant's servants were guilty of negligence, and that their negligence was the proximate and sole cause of the death of plaintiff's intestate?

In considering this question we may say in the outset and without reference to the evidence in detail, that it is conclusively shown that the deceased, who was certainly not under

thirteen years of age, and from the shadowy evidence as to his age might have been as much as fourteen years old, was of sufficient intelligence, experience and capacity to be held guilty of contributory negligence, considered with reference to the particular situation presented in this case. It may also be stated here, that it is not seriously claimed that when the engineman of the defendant first saw the deceased and his companions walking along the footway leading to the defendant's tracks, before a view of them became obstructed by the tower and when the approaching train was some five hundred feet away, a duty was imposed upon him to take precautions to prevent deceased from going upon the tracks in front of the rapidly approaching train; nor is it claimed that the train, by reason of the engineman's seeing the deceased and his companions walking along the pathway towards the tracks and before they reached the tower, should have been brought to a stop before its engine reached the tower.

The question, therefore, upon which the case turns is: What was the negligence of the defendant's servants that alone caused the death of plaintiff's intestate? In other words, when did the engineman have reason to believe that the deceased was going into a dangerous position, or when should he have discovered the intention of the deceased to disregard his own duty to look and listen for the train and to walk upon the tracks in front of the rapidly approaching train; and, if after the engineman saw, or ought to have seen, the deceased's dangerous situation, did he or did he not use all reasonable means at his command to prevent injury to the deceased?

According to plaintiff's own witnesses, the deceased was paying no attention to the approach of any other train to the crossing, but with his eyes fixed on the moving freight train in front of him he walked, at the speed of from three to four miles an hour, over the interlocking switch system, in the path passing near to the tower, and upon the track in front of

the on-rushing train, which instantly struck him; and that
when deceased stepped up on the switch rods the train was at
least fifty feet away, none of the witnesses putting it at a
distance greater than ninety-six feet, while the engineer run-
ning the train says that when deceased stepped upon the
switch rods and had taken a second step indicating a purpose
to keep on in the direction of the tracks, the engine was right
at the tower-house. All the witnesses agree that deceased was
struck the very moment that he stepped upon the railroad
track, and that his nearest companion was but a few feet
behind him. Accepting as true the statement of plaintiff's
witnesses that when deceased stepped upon the switch rods
and when the engineman first saw him after he emerged from
behind the tower, the train was not less than fifty nor more
than ninety-six feet away, what duty did he owe to the de-
ceased which he neglected to perform? Certainly it was not
his duty to stop the train, for all the authorities agree that he
had the right to presume that the deceased would stop before
reaching the track in front of the moving train, there being
nothing in his appearance to indicate that he was not con-
scious of the dangerous situation he was approaching. A con-
clusion that if the alarm whistle of the engine had been
sounded deceased would have heard it and would not have
gone upon the track, would be purely conjectural, especially
in view of the uncontradicted evidence that the moving freight
train but a short distance from deceased was making a great
noise, and an unusual rattling by reason of its crossing over
the Virginian Railway track. Under the presumption that
operates in favor of enginemen in such a situation, the en-
gineman was under no duty to do anything until he discovered
deceased's danger, and this was not, under the facts and cir-
cumstances shown, until he had stepped upon the tracks. The
track itself admonished him of danger, and the noise of the
freight train in front was sufficient to admonish one of his
age, intelligence, experience and capacity to take care before

walking upon the railroad track; yet he neither looked nor listened for an approaching train. A finding that the defendant, upon the evidence in the case, considered as upon a demurrer thereto, was guilty of negligence, which alone caused the death of the deceased, could proceed only from conjecture and speculation as to what the defendant could, might or ought to have done to avoid the injury to deceased.

In *Humphreys* v. *Valley R. Co.*, 100 Va. 749, 42 S. E. 882, the contention was made that if the engineman on the train had sounded the alarm whistle when he discovered Humphreys to be in danger, it would have caused him to get off the track, but it was held that, under the circumstances of the case, even if the expert witnesses had said that the sounding of the whistle would have caused him to get off the track, it would have been nothing more than conjecture. *So. Ry. Co.* v. *Bruce*, 97 Va. 92, 133 S. E. 548.

In *N. & W. Ry. Co.* v. *Cromer*, 99 Va. 763, 40 S. E. 58, it was held that the trial court erred in refusing an instruction which told the jury "that the burden of proof is on the plaintiff to prove negligence, and that the proof must amount to more than a probability of a negligent act; that the verdict cannot be founded upon conjecture."

In an action to recover damages for an injury inflicted through the alleged negligence of the defendant, the burden is on the plaintiff to prove the negligence alleged, and the evidence must show more than a mere probability of negligence. It is not sufficient that the evidence is consistent equally with the existence or non-existence of negligence. There must be affirmative and preponderating proof of the defendant's negligence. *N. & W. Ry. Co.* v. *Cromer, supra.*

The decisions of this court as to the duties and obligations resting upon those operating a railway train towards persons observed to be near or upon the track in front of an approaching train, lay down as a guiding principle of law, that an honest discretion is permitted the trainmen in the exercise of

that common sense presumption which the law everywhere allows, that persons in front of a train, in the apparent exercise of their faculties, will keep out of the way, and the only limit and qualification of the presumption is, that when to the observation of the trainmen there first appears some indication calling for a suspicion of peril, then for the first time arises the duty to take such precaution as may be required by ordinary care to warn and avoid injury to a person in such suspected danger.

In the case at bar, the engineman, as we have seen, stated that when the deceased stepped. up on the switch rods, his suspicion was aroused, but this was not sufficient to take away from the engineman the right to indulge the presumption that he (deceased) would keep out of the way of the on-rushing train, and the right to that presumption continued until there was reason to believe that the deceased was not going to keep out of the way of the train, and then all was done that it was possible to do to avoid injury to him. "I was looking for him to stop," says the engineman. It is shown that from the farthest side of the switch rods to the nearest rail of the track on which the train was approaching was eleven feet, and as the path that the deceased was travelling ran diagonally from the switch rods to the track, the deceased had to travel twelve feet to get on the track, while the train, travelling at twenty-five miles an hour, had, according to plaintiff's evidence, to travel only fifty feet or a little more before reaching the deceased.

In *N. & W. Ry. Co.* v. *Dean*, 107 Va. 505, 59 S. E. 389, the injured party was upon the railway track, and there, as here, a recovery of damages was sought on the ground that the engineman had not taken proper precaution to avoid injury to Dean, but the recovery was denied, and the opinion by Keith, P., in discussing the rule governing in such a case, held: "If his presence is observed by careful and experienced men operating the train, and they, in the exercise of their

best discretion, do not regard him in danger until on getting nearer to him he appears to be unconscious of his peril, and they then do all in their power to prevent an injury to him, though without avail, the company is not liable."

The opinion in that case also uses the following language: "If the emergency brake had been applied at the instant Whitworth (conductor) discovered the presence of Dean upon the track, the accident would have been averted; but, in the honest exercise of his descretion, in the light of his long experience, he did not at that moment consider Dean in a position of peril. He appears to have been an intelligent official; and there is no reason to suppose that his conduct was not controlled by an honest purpose to do his duty, or that he did not give the signal to steady and then to stop to the engineer as soon as the danger of Dean's position became apparent to him." See also *N. & W. Ry. Co.* v. *Solenberger*, 110 Va. 606, 66 S. E. 726, 857.

It is made clearly to appear in this case that Cousins, the engineman running the engine which struck the deceased, was an intelligent and capable official of long experience in the employ of the defendant company, and in this connection we refer again to the fact that when he first saw the deceased after the latter emerged from behind the tower he (deceased) was at least twelve feet out of danger, and there is no evidence even tending to prove that after he got in a perilous situation by stepping upon the track it was possible for the engineman to prevent his being struck by the engine, for plaintiff's witnesses say that he was struck at the instant he got upon the track, and before the alarm whistle had ended.

In *Humphreys* v. *Valley R. Co.*, *supra*, it is shown that a situation may appear different to those operating the train, and to those in different positions; and in *Southern Ry. Co.* v. *Daves*, 108 Va. 378, 61 S. E. 748, in which an infant eight years of age who had been seen by the engineer approaching the track, got upon the railway track in front of

a backing train and was struck and severely injured, it was held, that "a railroad company cannot be held liable for the failure of its engineer to anticipate that a person, whether an infant or adult, approaching a crossing is going to step upon the track immediately in front of a moving engine, unless there is something to suggest that such person does not intend to remain in a place of safety until the train has passed."

In *C. & O. Ry. Co.* v. *Hall's Admr.*, 109 Va. 296, 63 S. E. 1007, after stating that the doctrine of the last clear chance had no application to the facts of the case, the opinion by Harrison, J., says: "The fireman first saw the deceased when she was about to turn upon the little bridge in the direction of the crossing, but he did not know that she was going to attempt to cross, and he had a right to presume that she was not going to drive on the track in front of a rapidly moving train in plain view. *So. Ry. Co.* v. *Daves*, 108 Va. 378, 61 S. E. 748. When he realized that she was going to attempt to cross, there was nothing that he could do to save her. He did not even have time to call to the engineer."

We are of opinion that the verdict of the jury in this case, finding the defendant guilty of negligence resulting in the death of plaintiff's intestate, is without sufficient evidence to support it. Therefore, the judgment of the circuit court upon the verdict must be reversed, the verdict set aside, and the cause remanded for a new trial.

*Reversed.*