# Richmond

RICKY EDSEL ROBBINS, AN INFANT, WHO SUES BY HIS FATHER AND NEXT FRIEND v. OLD DOMINION POWER COMPANY, INCORPORATED.

June 10, 1963.

Record No. 5563.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, I'Anson and Carrico, JJ.

The opinion states the case.

*J. B. Browder* and *Jay G. Kauffman* (*Rufus G. Coldwell, Jr.; Browder, Russell & Morris*, on brief), for the plaintiff in error.

*Robert M. Odear* and *W. T. Bowen*, for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

This proceeding was instituted by a motion for judgment in behalf of Ricky Edsel Robbins, an infant, by his father and next

friend, to recover damages for injuries sustained by the infant when he climbed a steel tower belonging to Old Dominion Power Company, Incorporated, defendant, and came into contact with a current of high voltage electricity.

The infant plaintiff, sometimes hereinafter referred to as Ricky, charged the defendant with negligence in the construction and maintenance of the steel tower carrying high voltage electric wires; and in failing to provide warning signs of the danger therefrom.

A demurrer by the defendant was overruled. It then filed a response, denied all negligence, and pleaded that the infant plaintiff was a trespasser and guilty of contributory negligence. The case came on to be heard before a jury. Defendant moved to strike plaintiff's evidence at the close thereof, and renewed the motion at the conclusion of all the evidence. Both motions were overruled. The court, in ruling upon the second, explained its action, significantly, saying:

"I am going to overrule the motion. As I said before, I am not certain the plaintiff has or has not a case. I am not certain enough to rule. I am going to proceed with the case, so the record will have the entire proceedings in it from beginning to end, and whoever takes a look at it will be in a better position and have more time to rule on it more intelligently. I am going to overrule the motion at this time." *Gray* v. *Van Zaig,* 185 Va. 7, 37 S. E. 2d 751.

The trial lasted five days. The jury returned a verdict for plaintiff, which the defendant moved to set aside as contrary to the law and the evidence and without evidence to support it. The court granted the motion, upon the grounds assigned, and entered judgment for the defendant. We granted this writ of error.

We are asked by plaintiff to reverse the judgment and reinstate the jury's verdict in his favor, or award him a new trial. He argues that the court erred in holding that no negligence of the defendant had been shown, and in refusing the admission of certain evidence. He admits that the so-called attractive nuisance doctrine is not here applicable, and abandons his contention that the electric wires were required to be insulated. As stated in his brief and argument, he places his main reliance on the charge that the tower was negligently constructed and maintained, in that it was built so that it could be "easily ascended to a position of immeasurable peril" by a child of tender years.

The following facts are undisputed:

The defendant is a public service corporation engaged in trans-

mitting and distributing electric current over wires on 109 towers from Pocket, Virginia to Appalachia, Virginia, a distance of 16.6 miles. The line was constructed in 1915 on land over which the defendant owns a right-of-way. The wires, some of them carrying a voltage of approximately 69,000 volts, were attached to insulators extending from the towers, so that the wires did not have any direct contact with the towers. The towers are patrolled periodically by helicopter, at least twice a year, and repairs are made when needed.

Ricky, 12 years of age at the time of the accident, the eldest of six children, resided with his parents in the village of Meadow Fork, Lee county, Virginia. He is a bright boy, in the seventh grade at school, possessed a considerable intelligence, and had successfully passed each school grade with credit. In Meadow Fork there are fifteen homes, a church and a store, situated along the sides of an unimproved gravel road. Surrounding the village and near the homes is a densely wooded and rugged mountainous area.

There is no evidence as to how Ricky climbed the tower, or how he received his injuries, except his own statement. On the afternoon of September 20, 1960, after returning home from school, Ricky and Wayne Penley, a 9-year-old boy, went into the woods in search of the grandfather of Wayne Penley. They understood that the elder Penley had gone hunting, and they wanted to join him. Upon getting into the woods, they heard a shot. They then walked on farther until they reached defendant's tower No. 21. Then, testified Ricky, this occurred:

"A. So when we got to this tower, back out from this tower, we heard a shot over the hill. We walked through there and got to the tower. We climbed the tower. Next thing I knew, we was on the ground. I was on the ground.

"Q. Why did you climb the tower?

"A. We were going to see if we could see that man down over the hill.

"Q. Which man?

"A. Wayne's grandfather.

"Q. How did you climb the tower, Ricky?

"A. I don't remember.

"Q. You don't remember anything about climbing the tower?

"A. No, sir.

"Q. When you 'came to,' where were you?

"A. I was down at the tower laying. I 'came to' and looked and seen how I looked.

"Q. Do you remember anything about whether or not you touched any of the high tension wires?

"A. No, sir.

"Q. Which direction were you trying to look when you were up on the tower?

"A. I don't remember.

\* \* \* \* \* \* \* \* \* \*

"Q. Do you recall whether or not Wayne Penley climbed the tower with you?

"A. Yes, sir, he said he climbed it with me.

"Q. Not what he said. Do you remember whether Wayne climbed the tower with you?

"A. No.

"Q. You don't remember anything immediately preceding—I mean before the accident?

"A. No, sir.

"Q. After you were injured, Ricky, what happened to you then? Explain the events that happened after you were injured.

"A. Well, when I came to, I was looking up. I seen my arm black and pieces of skin hanging down, real black. I didn't know what happened. I didn't know what I was doing. I got up and walked on home. I met Mother somewhere. I don't remember meeting her. She took me to the hospital, her and my uncle—no, my grandfather and Collidge Gilbert went."

Ricky was gravely and severely injured, and will have permanent scars and certain physical disabilities for the remainder of his life.

Wayne Penley, the 9-year-old boy who was with Ricky, when the latter was injured, was summoned as a witness by the defendant. He appeared in court in response; but was excused from testifying. Thereupon he was requested to remain in court by plaintiff. He did so, but was not placed on the witness stand by the plaintiff.

"Failure to call an available witness possessing peculiar knowledge concerning facts essential to a party's case, direct or rebutting, or to examine such witness as to the facts covered by his special knowledge, especially if the witness be favorable to the party's contention, relying instead upon the evidence of witnesses less familiar with the matter, gives rise to an inference sometimes denominated a 'strong presumption of law' that the testimony of such uninterrogated witness would not sustain the contention of the party." *Altavista Cotton Mills* v. *Lane*, 133 Va. 1, 13, 14, 112 S. E. 637.

"There is no presumption against a defendant for failure to call

witnesses when the plaintiff carrying the burden of proof has not made a *prima facie* case, and such presumption cannot be used to relieve the plaintiff from the burden of proving his case." *Hutcheson v. Savings Bank of Richmond,* 129 Va. 281, 290, 105 S. E. 677.

"It is, of course, true that the unexplained failure of a party to produce a material witness raises a presumption that his testimony would have been adverse." *McGehee v. Perkins,* 188 Va. 116, 126, 49 S. E. 2d 304.

See also 20 Am. Jur., Evidence, § 187, page 192.

Tower No. 21 is located 1,300 feet in a straight line from Ricky's home. It is on the top of a mountain ridge which is 320 feet higher than his home and 2,080 feet above sea level. The entire area surrounding the tower is "mountainous, densely forested terrain." One witness described it "as just one mountain after another." The contour of the land's surface and the density of trees and shrubs are such that the walking distance from plaintiff's home to the tower is approximately one-half of a mile. The tower cannot be reached by an ordinary motor vehicle. It is entirely on defendant's right-of-way, and there are no public roads or ways near it. It is not on or near a playground, a recreation area, or school grounds. It is not fenced in, and there are no signs posted on or near it warning of danger.

Tower No. 21 is of steel construction, located on uneven ground on top of a mountain ridge. It is supported by four legs embedded deeply in the ground. The ground is higher at the center of the tower than at two of its four legs. The base dimension of the tower is 12 feet, by 11 feet, 3 inches. It rises to a height of 40 feet, 2 ¼ inches. Between the four corner legs are steel cross-members, some running horizontally, and others diagonally, with the ground, to brace and support the tower against the weight of the wires and the forces of nature. The lowest electric transmission wire is 23 feet above the ground.

Bolts or metal spikes are embedded in an exterior part of one of the corner legs or posts, which are used to form a foot ladder for employees of the company to ascend the tower for repairs and maintenance. The lowest bolt is not directly above the highest ground under the central part of the tower.

The evidence is somewhat conflicting as to where the bolts are located with reference to distance from the ground and from the cross-members of the tower. Plaintiff introduced evidence to the effect that the first bolt was 9 feet from the ground directly underneath it, and 7 feet from the highest point on the ground under and

around the tower; that the lowest cross-member was 22 inches above the highest point of the ground surface; and that at a point directly below the first bolt the cross-member is 46 inches above the ground surface, the next cross-member 41 inches higher and the next 48 inches above that. On the opposite corner the lowest cross-member is 29 inches above the surface.

Defendant introduced witnesses and sketches or drawings by engineers showing the tower's construction. Its witnesses testified that, by actual measurement, the lowest bolt was 8 feet, 10½ inches from the nearest point on the ground around the tower, but a little farther straight down the post; that the first cross-member was 1 foot, 6 inches above the closest ground surface beneath it; that from the first cross-member to the second cross-member was "approximately" 2½ feet; and the distance from the first cross-member to the lowest bolt was 7 feet, 2½ inches.

Plaintiff contending that, according to his measurement, the first bolt was too close to the ground, presented in evidence, without objection, the rules and regulations of the National Electric Safety Code contained in a Handbook of the National Bureau of Standards, which recommends that: "Steps closer than 6½ feet from the ground or other readily accessible place should not be placed on poles." It appears that the above regulation is used as a standard by the electrical industry, and is so accepted by the State Corporation Commission of Virginia.

Numerous engineers, electrical, civil and mechanical, testified, without contradiction, that the tower was constructed in accordance with the best usage and custom of the electrical industry, and not in violation of the National Electric Safety Code.

The exhibits and the testimony show that one can climb the steps of the tower and never touch a wire, as employees of the company apparently did in pursuance of their duties.

Plaintiff does not claim that defendant had actual knowledge that children played around the tower and on it; but insists that it had constructive notice thereof. To establish constructive notice, he relies upon evidence to the effect that over a period of several years young children had gone to the vicinity of the tower, and on several occasions had been seen on the tower. A 15-year-old boy admitted that 4 or 5 years ago, he had climbed up to the second bar or cross-member. Darwin Gilbert said he and Sam Holmes had seen an 8- or 10-foot rope hanging from the tower with a stick in it, and "the ground was worn through under it." Sam Holmes corroborated

Gilbert. He did not live in the area; but had hunted there 25 or 30 times each year during the past 7 or 8 years, and "8 or 10, or maybe 12 times" had seen children "on the tower." Other witnesses, who had hunted in the area, said they had not seen any children on the tower.

On behalf of the defendant, numerous witnesses, residents of the Meadow Fork area for periods running from 8 to 35 years, testified they had never seen or heard of any children playing on or about the tower. Milton Napier, who owned the land over which defendant had a right-of-way, and had lived there for 35 years, said he had never seen any children on or close to the tower. Buford Penley, father of Wayne Penley, who had lived there for 32 years; Charles Gilbert, who lived there for 8 years; Silven Rutherford, who lived there for 12 years, testified to the same effect. Wayne Woodart, 22 years of age, said he had been by the tower 8 or 10 times while hunting, and had never seen any children near it.

Buford Robbins, father of Ricky, erroneously called Hubert Robbins in the pleadings, called as a witness by plaintiff, had been at the tower "not less than 1,000 or 2,000 times," and "never saw a single child on the tower." Ricky, the infant plaintiff, said that prior to his injury, he had never climbed the tower himself nor had seen any other children climb it.

Employees of the defendant testified, without contradiction, that they had never seen or heard of children playing on the tower or near it. The evidence, as a whole, shows rather clearly that no children frequently, constantly or habitually played on or around the tower.

In view of the deadly and insidious nature of electricity, a high degree of care is imposed upon those maintaining electric lines to guard and protect those who are liable to come in contact with the wires. The courts have variously described the care required as "high," "great," and "utmost." The question as to the liability of the owner for injury to, or the death of, one coming in contact with electric current depends definitely upon the particular factors or circumstances present, the owner not being subject to liability under all circumstances. Annotation, "Liability for injury of child on electric transmission tower or pole," 6 A. L R. 2d, pages 755 *et seq.*

In Virginia, in a long line of cases, we have held that those who engage in the production and distribution of electricity are required to use a high degree of care—care commensurate with the danger involved—to prevent injury to others. This is especially true where it

is known that children of tender years play, or are likely to play, around electric wires, and at places where others have a right to work or may reasonably be expected to go for work, business or pleasure. *Smith* v. *Virginia Electric and Power Co.*, 204 Va. 128, 132, 133, 129 S. E. 2d 655; *Northern Virginia Power Co.* v. *Bailey*, 194 Va. 464, 469, 73 S. E. 2d 425; *Trimyer* v. *Norfolk Tallow Co.*, 192 Va. 776, 783, 66 S. E. 2d 441; *Haywood* v. *South Hill Manufacturing Co.*, 142 Va. 761, 128 S. E. 362; *Waddell* v. *New River Co.*, 141 W. Va. 880, 93 S. E. 2d 473. Cf. *Daugherty* v. *Hippchen*, 175 Va. 62, 65, 66, 7 S. E. 2d 119; 29 C. J. S., Electricity, § 39, page 575; 18 Am. Jur., Electricity, § 48, page 443.

In *Waddell* v. *New River Co., supra*, the facts and issues are somewhat similar to those here. There the defendant owned and maintained in an uninhabited area, difficult of access, a power pole to which were attached uninsulated wires carrying high voltage electricity. The pole was situated 1,385 feet from the infant plaintiff's home, and 1,525 feet from the nearest road. The pole was guyed by two parallel guy wires, one directly over the other, the distance between them ranging from 4 feet near the ground to 6 feet at the pole, in accordance with the best usage and practice of the electrical industry. Plaintiff, a boy 14 years and 7 months old, traveled from his dwelling to the pole, climbed 30 feet up the guy wires to a point nearly 24 feet above the ground, then reached over a distance of two feet, grasped an uninsulated wire, and was seriously injured. The court held that the evidence was insufficient as a matter of law to be submitted to a jury upon the question of defendant's negligence.

The plaintiff mainly relies, as we have stated, on his claim that the lowest bolt or spike of the ladder was negligently set so close to the ground as to make the tower "readily" ascendable by a child of tender years. Plaintiff admits that the lowest bolt forming the ladder was at least 7 feet above the ground directly underneath it; but he insists that it was less than 6½ feet distant from the first brace or cross-member, in violation of the Safety Code.

The answer to his contention is that there is no evidence as to how Ricky climbed the tower. He said he did not know how he was hurt. There is no evidence that he used the bolts, the braces, or cross-members, or any other method in climbing the tower. He could have "shinned" up its legs. He could have used a rope, a pole, a wooden ladder, a grapevine, or some other means.

The alleged cause of the injury was from a wire or wires 23 feet

above the ground, wires which did not touch the tower and appear from the evidence to be distant 3 feet therefrom. There is no evidence to show that the location of the bolts, the braces or cross-members of the tower caused Ricky to come into contact with the electric current, or wires, or that their construction was a proximate cause of his injury. There was shown no causal connection between any alleged defect and his injury. The manner in which he climbed the tower and how he came in contact with the electric current are purely speculative and conjectural.

We agree with the learned trial judge that the evidence fails to show actionable negligence on the part of the defendant. The verdict of the jury was, therefore, contrary to the law and the evidence and without evidence to support it.

In view of the conclusion which we have reached, it becomes unnecessary to consider or discuss incidental questions raised by other assignments of error by the plaintiff.

For the reasons stated, the judgment of the trial court is affirmed.

*Affirmed.*