**Henry James TAYLOR, an infant who sues by and through his mother and next friend, Gertrude Marie Taylor, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 2489.**

United States District Court
E. D. Virginia,
at Alexandria.

June 4, 1965.

Elmer B. Gower, Springfield, Va., for plaintiff.

MacDougal Rice, Asst. U. S. Atty., Alexandria, Va., for defendant.

LEWIS, District Judge.

Henry James Taylor, through his mother and next friend, seeks damages from the United States for severe personal injuries sustained when he came in contact with high-voltage wires after he got inside a transformer substation near his home at Fort Belvoir, Virginia.

Suit was brought in this court under Chapter 171, Title 28, United States Code, pursuant to an act of the Congress of the United States, approved September 21, 1961, for the relief of Henry James Taylor. The act provided that nothing therein shall be construed as an admission of liability on the part of the United States.[1]

Upon retrial in accordance with the opinion rendered by the United States Court of Appeals for the Fourth Circuit (326 F.2d 284), the contentions of the parties were developed somewhat more extensively than during the first trial. In addition to using the same witnesses and exhibits offered during the first trial, each side presented additional evidence, technical experts and exhibits. From the record thus made, together with the interrogatories and the pre-trial deposition of the plaintiff, the Court's augmented findings are as follows.

Henry, an infant of seven years and nine months at the time of the accident, was living with his mother at Fort Belvoir, Virginia. His father, Sergeant Major John D. Taylor, was then on duty in Camp Tugo, Greenland. The Taylor home (one of a group assigned to noncommissioned officers) was located about one hundred fifty yards from the transformer substation here in question.

In late 1955 or early 1956 the Government contracted with the Walter Truland Corporation to build a transformer substation at Fort Belvoir as an adjunct to the DeWitt General Hospital. The substation was erected in accordance with plans and specifications and was turned over to the appropriate officials of Fort Belvoir April 20, 1956. It was maintained and operated thereafter as a part of the Fort Belvoir reservation.

The transformer substation is located on the side of a hill immediately behind the DeWitt General Hospital, then being built at Fort Belvoir, Virginia. The site, after being cleared and leveled by flattening out the side of the hill, consisted of natural bank gravel. Upon completion the area was covered with washed gravel ranging from one to three inches in size. The framework supporting the high-voltage wires (some twenty feet above ground) and other electrical equipment, including the adjacent shed or building, was installed and erected on a concrete pad, all of which was enclosed by an industrial-type fence. This fence was constructed of steel pipe posts set in concrete at regular intervals and a framework of pipe connecting these posts near their tops with horizontal bracing pipes about two-thirds the height of the fence at the corners and adjacent to the gate, and covered from the outside with a seven-foot woven wire mesh of two-inch by two-inch diamond-shaped design. Three spaced strands of barbed wire were stretched on projections of wire above the steel pipe posts. These projections extended outwardly at approximately a forty-five degree angle and upwardly approximately one foot, except that at the gateposts the projections extended vertically above the posts. The total height of the fence was approximately eight feet. It was located about three feet in from the outer edge of the graveled area and some fifteen feet away from the high-voltage equipment, leaving a level three-foot apron all around the fence. The bank was then sloped on a 2: or 3:1 grade from the apron to blend in with the adjacent hillside. The slopes were not sodded or compacted in any manner. There was no curbing or retaining wall. The entrance to the transformer substation was through double gates made of the same material and of the same height as the fence. These gates were kept locked at all times.

1. Private Law 87–200, 87th Congress, H.R. 4369.

The enclosure fence here built was of the same type and kind used by other purveyors of electricity in this vicinity.

The Government made no inspection of the fence or apron surrounding it between the date of the acceptance of the facility and the date of the accident.

Inspection immediately after the accident disclosed a depression or hole under the fence on the side nearest the hospital. The depression or hole then was about four feet in width and eight inches in depth, tapering off on the sides to three or four inches.[2] (The bottom strand of the fence was built to sit about two inches above the gravel floor.) There was a pile of gravel—"maybe six or eight inches" [in height] a foot or two "back from the hole"—"like it was pulled out from under the fence." The hole appeared to be manmade. There was no evidence of washing, erosion or settling.

The plaintiff's father and a Mr. Holland (plaintiff's expert) both expressed the opinion that the land upon which the transformer substation was built is liable to erosion.

The plaintiff's father and another witness (an electrician) both testified the hole looked to them as though it had been created by drainage or erosion.

Children living on the post played in and around the wooded area before the hospital and transformer substation were built. Some were known to play near the site after the contruction was completed. Children—according to the plaintiff's father—were permitted to play all over the place, including on the golf course.

Henry played in the woods back of his home before the transformer was built. (It was erected behind the hill about one hundred fifty yards from his home.) His father warned him—"This was very dangerous. This was an electrical appliance and there was electricity there that could electrocute people." Henry's mother had also told him to keep away from the place.

Henry had been inside the substation enclosure on at least three previous occasions. He went there because he was curious. He either walked or rode his bicycle. His friend Roy Ethridge (six months younger) was usually with him. The boys got inside the substation the first time by climbing over the fence. On the other occasions they crawled under the fence.

Henry was looking for an easier way to get inside when he found the hole. He had to remove some rocks to get through—"It took him awhile to remove some gravel." Both boys testified they had to remove a handful or so of rocks when they crawled under the fence.

After gaining entrance to the substation on the day of the accident, Henry climbed up among the breakers—Roy told him he shouldn't go up there, he might get hurt or fall. His burnt clothing was found on top (twenty feet) of one of them. He was injured when he got into the high-tension line at the transformer banks.

Henry was removed from the breakers in a badly burned condition from the hips up, requiring extensive plastic surgery in an endeavor to remove the marked amount of contractures in the region of the scapulae and neck. He has been hospitalized some two hundred days and will require about fourteen additional operations during the next eight or ten years in order to be cured as completely as possible of the injuries sustained. His hospitalization and medical services have been furnished by the Government, the plaintiff being a dependent of an active member of the armed forces of the United States.

Henry lost some six or eight months from school and will lose more time from school as and when the necessary future operations are performed. His teacher at Fort Belvoir, who taught him when he again entered the Fort Belvoir school after the accident, testified that Henry was an above average student. His sub-

2. See Exhibits Nos. 3, 7 and 14—pictures taken at different angles a week or so after the date of the accident.

sequent scholastic record corroborates this opinion.

Although Henry engages in some of the usual athletic activities engaged in by boys of his age, such as swimming and playing baseball, he has been substantially handicapped in these activities both on account of his contractures and the embarrassment occasioned by the numerous scars on his torso, neck and shoulders.

The plaintiff seeks recovery from the United States on the ground of negligence. The negligence complained of was the building and operating of a twenty-two thousand-volt transformer substation, easily accessible to children, without proper safeguards.

The defendant says it exercised the care required by law in building and maintaining the substation in question but if such not be the case the plaintiff's contributory negligence bars his recovery.

Justice Spratley, speaking for the Supreme Court of Appeals of Virginia in Robbins v. Old Dominion Power Company, 204 Va. 390, 131 S.E.2d 274 (1963), decided since the first hearing of this case, summarized the applicable Virginia law as follows:

"In Virginia, in a long line of cases, we have held that those who engage in the production and distribution of electricity are required to use a high degree of care—care commensurate with the danger involved—to prevent injury to others. This is especially true where it is known that children of tender years play, or are likely to play, around electric wires, and at places where others have a right to work or may reasonably be expected to go for work, business or pleasure. Smith v. Virginia Electric and Power Co., 204 Va. 128, 132, 133, 129 S.E.2d 655; Northern Virginia Power Co. v. Bailey, 194 Va. 464, 469, 73 S.E.2d 425; Trimyer v. Norfolk Tallow Co., 192 Va. 776, 783, 66 S.E. 2d 441; Haywood v. South Hill Manufacturing Co., 142 Va. 761, 128 S.E.

362; Waddell v. New River Co., 141 W.Va. 880, 93 S.E.2d 473. Cf. Daugherty v. Hippchen, 175 Va. 62, 65, 66, 7 S.E.2d 119; 29 C.J.S. Electricity § 39, page 575; 18 Am.Jur. Electricity, § 48, page 443."

In the Robbins case a twelve-year-old boy climbed an unfenced tower located in a remote area about one-half mile from his home and came in contact with high-voltage electric wires located some twenty-three feet above ground. The trial court set aside the verdict and the Supreme Court of Appeals of Virginia affirmed on the ground the evidence failed to show actionable negligence on the part of the defendant.

In the Smith case a surveyor's rod came in contact with an overhead electric wire some fifteen to twenty feet above ground while he was looking backward instead of upward. The trial court struck the plaintiff's evidence and the Supreme Court of Appeals of Virginia affirmed, holding that the plaintiff was negligent as a matter of law.

In the Bailey case an orchard worker, walking a twenty-four-foot metal ladder in an upright position, came in contact with an overhead distribution line some twelve feet from the closest branch of a tree and some twenty-four feet above ground. A jury verdict for the plaintiff was affirmed by the Supreme Court of Appeals of Virginia.

The wires which caused the plaintiff's injuries in the Trimyer case were thirty-five feet above his head, open and obvious. He knew they were electric wires. The tip of a thirty-five-foot crane came near or contacted the high-voltage wire. The Supreme Court of Appeals of Virginia affirmed a verdict for the defendant.

In the Haywood case the owner was held liable for leaving a highly charged uninsulated wire within the arm's length of a child who was passing along the sidewalk. On the morning of the accident an infant of eleven years was passing the transformer, having in his hand a piece of an old saw some fifteen inches in length which he had picked up in walk-

ing along the street or path. With this piece of saw he thrust his hand and forearm through the wire fence [the ordinary wire fence in common use upon farms] bringing some part of the saw in contact with the electrified part of the transformer.

In the Waddell case a boy fourteen years seven months of age climbed a guy wire some twenty-four feet above ground, reached out about two feet, and grasped an uninsulated electrically charged wire. The Supreme Court of Appeals of West Virginia reversed judgment for the plaintiff on the ground—no factual question for jury determination.

In the Daugherty case the owner unsecurely stored dynamite, dynamite caps, alcohol and acid, along with many other articles, in a tool house or shed, the door of which was left open nearly all the time. He actually knew that children of tender years frequently played in the vicinity of the tool house and must have known that they would be likely to go into the tool house. He must also have known that they, acting upon childish impulses, would take the shiny dynamite caps which had been left in a box on the floor easily accessible to them. His conduct in this respect was left to the jury. They determined he was negligent and that the infant plaintiff was free of contributory negligence. The Supreme Court of Appeals of Virginia affirmed.

In Rieder v. Garfield Manor Corp., 164 Va. 192, 178 S.E. 677, the Supreme Court of Appeals of Virginia held that the defendant exercised the proper degree of care as a matter of law in storing dynamite caps, and when a boy broke into the storehouse, which was securely fastened, and climbed up to a rafter and obtained caps that had been placed out of danger, and was injured by an explosion of one of them, he could not recover.

In Johnson v. United States, 270 F.2d 488 (9th Cir.), a four-and-a-half-year-old child gained access to a transformer substation, apparently by climbing over the gate, and while inside the enclosure climbed the metal framework and came in contact with approximately nineteen thousand volts of electricity. This case arose in Montana where the doctrine of attractive nuisance has long been recognized. The substation there was protected by a fence, substantially the same as here, and the Court held that

"The construction of the substation fence and gates * * * provided such safeguards as would prevent injury to a small child of ordinary and normal instincts, habits and training, and such as would be constructed by an ordinarily prudent person taking into consideration all of the risks involved."

The Government, in building and guarding its transformer substation from children and others, used the same methods and procedures employed by other purveyors of electricity in this vicinity. Its high-voltage wires were some twenty feet above ground at or near the top of a metal framework centered some fifteen feet inside a leveled area covered with three inches of washed gravel, all of which was completely surrounded with a standard industrial-type wire mesh seven-foot fence topped with three strands of barbed wire. The entrance gates were kept locked at all times. There were no walks, roads or paths leading to or near the substation site.

Such precautions would have been sufficient to free the Government of negligence had those responsible maintained the substation in proper repair. Here the facility was built on a hillside. The leveled area was sloped from the apron surrounding the fence to blend in with the hill. (The grade varied from 2: to 3:1.) These slopes were covered with washed gravel—they were neither sodded nor compacted in any manner. Probable settling or erosion from the elements, under these conditions, required such periodic inspection of the premises as was necessary to keep the fence and surrounding apron in a safe condition. Assuming the failure of the Government to

discover and repair the depression or hole under the fence was a proximate cause of the plaintiff's injuries [there was no showing that the failure to inspect and repair caused Henry to come in contact with the electric wire some twenty feet above ground], the plaintiff cannot recover if he is chargeable with contributory negligence.

■ In Virginia children between the ages of seven and fourteen are presumed to be incapable of exercising care and caution for their own safety and this presumption prevails unless rebutted by sufficient proof to the contrary. Grant v. Mays, 204 Va. 41, 129 S.E.2d 10 (1963), and cases cited therein.

■ The plaintiff falls within this age bracket. [He was then seven years and nine months of age.] The Government has the burden of overcoming this presumption, unless disclosed by his own evidence. (See Norfolk Southern Ry. Co. v. Wood, 182 Va. 30, 28 S.E.2d 15.)

The evidence in re this phase of the case discloses that the plaintiff was an above average student—that he was warned that this was an electric appliance and there was electricity there that could electrocute people—that he had been told to keep away from the place—that he had been inside the substation enclosure on at least three previous occasions—that he got inside the first time by climbing over the fence—that he was looking for an easier way to get in when he found the hole or depression under the fence— that both boys (Henry and his friend Roy) had to remove some rocks on each occasion when they crawled under the fence. Henry said it took him awhile to remove some gravel—that a pile of gravel some six or eight inches in height was found immediately following the accident a foot or two back from the hole "like it had been pulled out from under the fence."

After getting inside the enclosure Henry had to climb up the framework some twenty feet before he came in contact with the hot wires. This, at a time when he was told by Roy he should not go up there, he might get hurt or fall.

Upon these findings the plaintiff would have been guilty of contributory negligence, as a matter of law, had he been an adult.

■ Gauged by the standards [3] enunciated in Carlton v. Martin, 160 Va. 149, 168 S.E. 348,[3] for determining whether a child of the age of the plaintiff at the time of the accident was capable of exercising care and caution for his own safety, the Court finds the plaintiff had the requisite capacity and was guilty of contributory negligence in crawling under the fence and climbing up among the transformer banks on the day in question.

For the reasons stated judgment will be entered for the Government.

3. "The law recognizes that children of tender years do not possess that judgment and discretion usually exercised by adults, and whether under a particular state of facts they are capable of understanding and appreciating dangers with which they are surrounded depends, not only upon the age, general intelligence, maturity, and experience of the child, but also upon the nature of the perils to be encountered. The measure of duty in each case is determinable by the capacity ordinarily possessed and exercised by children of the age and development of the class to which the individual belongs. These general principles of the law are supported by numerous Virginia cases, among which are Williams v. Lynchburg Traction, etc., Co., 142 Va. 425, 128 S.E. 732; Norfolk & W. R. Co. v. Overton's Adm'r, 111 Va. 716, 69 S.E. 1060; Richmond Traction Co. v. Wilkinson, 101 Va. 394, 43 S.E. 622; Lassiter & Co. v. Grimstead, 146 Va. 773, 132 S.E. 709; Blankenship v. Chesapeake & O. R. Co., 94 Va. 449, 27 S.E. 20."